ZYDECO'S II, LLC, ZYDECO'S CORP, DUSTIN GAINEY AND ROSEMARIE GAINEY

VERSUS

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO CERTIFICATE/POLICY NO. D1180D150152-59633, DAVID BRENNAN, DAVE BRENNAN INSURANCE INC., AND BRAISHFIELD ASSOCIATES, INC.

NO. 19-CA-562

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-NINTH JUDICIAL DISTRICT COURT
PARISH OF ST. CHARLES, STATE OF LOUISIANA
NO. 82,255, DIVISION "C"
HONORABLE EMILE R. ST. PIERRE, JUDGE PRESIDING

May 28, 2021

**STEPHEN J. WINDHORST**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Marc E. Johnson, and Stephen J. Windhorst

**AFFIRMED IN PART; AMENDED IN PART AND AFFIRMED AS
AMENDED; REVERSED IN PART; AND VACATED IN PART**
    **SJW**
    **SMC**

**DISSENTS IN PART WITH REASONS**
    **MEJ**

COUNSEL FOR PLAINTIFF/APPELLEE,
ZYDECO'S II, LLC, ZYDECO'S CORPORATION
    Joel T. Chaisson, II
    Robert P. Charbonnet, Jr.
    Richard D. Roniger, II
    Graham J. Rees
    James S. Rees, IV

COUNSEL FOR PLAINTIFF/APPELLEE,
DUSTIN GAINEY, ROSEMARIE GAINEY, AND ZYDECO'S II, LLC,
ZYDECO'S CORPORATION
    Peter M. Donovan

COUNSEL FOR DEFENDANT/APPELLANT,
CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO
CERTIFICATE NO. D1180D150152-59633
    Martin A. Stern
    Raymond P. Ward
    Alexandra G. Roselli
    Henry S. Provosty
    Lena D. Giangrosso
    Zachary P. Fickes

**WINDHORST, J.**

Appellant/defendant, Certain Underwriters at Lloyd's, London ("Underwriters") appeals the trial court's June 24, 2019 judgment in favor of appellees, Zydeco's II, LLC and Zydeco Corporation, in the amount of $25,859,659.81.

For the reasons stated herein, we affirm the trial court's findings that (1) Underwriters improperly rescinded the insurance policy; (2) Underwriters violated its duties of good faith and fair dealing in the investigation and adjustment of the May 30, 2016 fire loss in violation of La. R.S. 22:1973; (3) Underwriters failed to pay the Zydeco plaintiffs' claim within 30 days of receiving satisfactory proof of loss in violation of La. R.S. 22:1892; and (4) as a result of Underwriters' improper rescission and violations of La. R.S. 22:1973 and La. R.S. 22:1892, the Zydeco plaintiffs sustained damages and are entitled to statutory penalties.

We further affirm the trial court's findings that (1) comparative fault is not applicable to Brennan and the Zydeco plaintiffs; and (2) La. R.S. 22:1973 and La. R.S. 22:1892 are applicable in this case. Given our findings herein, we amend the judgment and award the following damages to the Zydeco plaintiffs: (1) $900,000.00 for loss of the building and $100,000.00 for business personal property; (2) $2,900,000.00 for lost income; and (3) $5,800,000.00 for bad faith damages.

We vacate that portion of the trial court's judgment awarding attorney's fees in the amount of $7,388,474.23, and remand this matter to the trial court for further proceedings consistent with this opinion. We further reverse in part that portion of the judgment awarding legal interest on penalties and attorney's fees from the date of judicial demand until paid, and render judgment awarding legal interest as to the award of penalties from the date of judgment. The judgment is affirmed as amended and affirmed in all other respects.

**PROCEDURAL HISTORY**

Plaintiffs, Dustin and Rosemarie Gainey,[1] were the owners of Zydeco's II, LLC and Zydeco's Corporation, doing business as Zydeco's restaurant (collectively "plaintiffs").[2] The restaurant was completely destroyed by fire caused by lightning on May 30, 2016. Prior to the fire, Underwriters issued a commercial property insurance policy insuring the restaurant (herein after "the restaurant" or "the premises") with Zydeco's II and Zydeco's Corporations ("Zydeco plaintiffs" or "the insureds") as the named insureds.[3] The policy contained a limit of $900,000.00 for the building, and $100,000.00 for business personal property. The policy also contained a "Protective Safeguards – Fire P2" (the "P2 endorsement") which included the requirement of a centrally monitored fire alarm.[4]

After the fire, plaintiffs submitted a claim to Underwriters. While reviewing the claim, Underwriters learned that the premises did not have a centrally monitored fire alarm. On August 26, 2016, because the plaintiffs represented in their initial and subsequent applications for insurance that the premises had a centrally monitored fire alarm, Underwriters rescinded the policy and returned to plaintiffs all premiums paid on the policy for the past six years. By letter dated August 26, 2016, Underwriters denied coverage under the policy language and La. R.S. 22:1314 and stated that the policy "must be rescinded" under La. R.S. 22:860. The rescission letter informed the insureds that Underwriters determined that the "policy was null from its inception" because the insureds "misrepresented a material and principal

---

[1] Dustin and Rosemarie Gainey's individual claims were dismissed with prejudice in the January 9, 2019 judgment.

[2] Zydeco's II, LLC, owned by the Gaineys, was created to operate the restaurant. Zydeco Corporation, owned by the Gaineys, was created to own the property where the restaurant was located.

[3] The policies originally contained Bernard Ventures, LLC as a named insured.

[4] The P2 endorsement provided, in pertinent part, that:
   1. As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above.
   2. The protective safeguards to which this endorsement applies are identified by the following symbols:
"P-2" Automatic Fire Alarm, protecting the entire building that is:
   a. Connected to a central station; or
   b. Reporting to a public or private fire alarm station.

condition of the policy for the covered Property at the time of the policy application and renewals and continuing through the policy term period for the date of loss." Accordingly, the policy was rescinded and the premiums were returned to the insureds.[5]

In the petition for damages, plaintiffs contended that Underwriters' failure to pay the claim and the rescission of the policy violated La. R.S. 22:1892 and La. R.S. 22:1973, and that Underwriters was liable for penalties and attorney's fees. Plaintiffs also contended that Underwriters breached the duty of good faith and fair dealing pursuant to La. R.S. 22:1973 A and C.

The petition named Dave Brennan and Dave Brennan Insurance, Inc. (collectively "Brennan"), Brennan's professional liability insurance carrier, Certain Underwriters at Lloyd's, London Subscribing to Policy No. SLBPRO-IA-1944-15 ("E&O Carrier") and Braishfield Associates, Inc. ("Braishfield") as additional defendants. Prior to trial, Brennan and the E&O Carrier settled with the Zydeco plaintiffs and were dismissed with prejudice from the litigation on August 24, 2018. On September 19, 2018, the trial court granted Braishfield's motion for summary judgment, dismissing Braishfield with prejudice. The September 19, 2018 judgment further provided that consistent with La. C.C.P. art. 966 G, Braishfield "shall not be considered in any subsequent allocation of fault herein."

A judge trial on the merits was held on March 25-28, 2019. The trial court made the following findings of fact:

> 1) Certain Underwriters at Lloyd's, London's August 26, 2016 rescission of policy D1180D150152-59633 is hereby found to be invalid;
>
> 2) Certain Underwriters at Lloyd's, London violated their duties of good faith and fair dealing in the investigation and adjustment of the May 30, 2016 fire loss in violation of La. R.S. 22:1973;
>
> 3) Certain Underwriters at Lloyd's, London failed to pay the Zydeco's II, LLC and Zydeco's Corp.'s claim within 30 days of

---

[5] A check in the amount of $40,316.50 was returned to the Zydeco plaintiffs for premiums paid for all six policy periods.

receiving satisfactory proof of loss in violation of La. R.S. 22:1892;

4) As a result of Certain Underwriters at Lloyd's, London's improper rescission and violation of La. R.S. 22:1892 and 22:1973, Zydeco's II, LLC and Zydeco's Corp. sustained damages, to wit:

A) Loss of building in the amount of $1,228,561.86;
B) Debris Removal Costs of $28,500.00;
C) Loss of business of $4,900,000.00;

5) As a result of its improper rescission, Certain Underwriters at Lloyd's, London is liable to pay Zydeco's II, LLC and Zydeco's Corp. for the above listed actual damages sustained in the amount of $6,157,061.86;

6) As a result of Certain Underwriters at Lloyd's, London's violation of La. R.S. 22:1973, Zydeco's II, LLC and Zydeco's Corp., are entitled to statutory penalties of $12,314,123.72;

7) As a result of Certain Underwriters at Lloyd's, London's failure to pay a claim within 30 days of satisfactory proof of loss in violation of La. R.S. 22:1892, Zydeco's II, LLC and Zydeco's Corp. are entitled to attorney's fees in the amount of $7,388,474.23.

On June 24, 2019, based on these findings, the trial court rendered judgment in favor of the Zydeco plaintiffs and against Underwriters in the amount of $25,859,659.81, together with legal interest thereon from the date of judicial demand until paid.

**FACTS**

The following facts were elicited at trial. In 2010, Dustin and Rosemarie Gainey opened the restaurant located at 13228 US Highway 90 in Boutte, Louisiana. The Gaineys contacted their retail agent, Brennan, to obtain insurance for the restaurant. Brennan filled out a preliminary ACORD insurance application and contacted an intermediate broker, Standard Lines Brokerage, Inc. ("SLB") to solicit quotes from various carriers. SLB contacted Brennan and inquired as to the "blank sections" in the application concerning fire and/or burglar alarm coverage. Brennan subsequently marked that there would be fire and burglar alarms monitored by ADT on the premises. The applications were then submitted to the Gaineys for their signatures and sent to SLB. SLB solicited a commercial property insurance quote from Braishfield, a wholesale insurance broker, based on the application.

Braishfield is a "coverholder" for a syndicate of Underwriters in the United States, which means that Braishfield has binding authority to underwrite and issue policies in Underwriters' name within the guidelines and limits as stated in its contract with Underwriters.

Braishfield issued a quote to SLB for the commercial property insurance for the restaurant.[6] The quote contained two endorsements,[7] one of which was the P2 endorsement, which required a centrally monitored fire alarm.[8] This information was given to SLB, who submitted it to Brennan. The quote was accepted by the Gaineys through their signed application. Braishfield issued an insurance binder, effective August 6, 2010 until the policy was issued. The binder contained the P2 endorsement. On August 10, 2010, the policy was issued, effective August 6, 2010 through August 6, 2011, and it also contained the P2 endorsement. Braishfield sent the policy to SLB, and SLB forwarded the policy to Brennan to forward to the insureds. In 2010, Braishfield scheduled an inspection of the premises, which requested as a special instruction the confirmation of a centrally monitored fire alarm. The inspection report stated that Mr. Gainey "verbally confirmed" the presence of a centrally monitored fire alarm.

In August 2011, the insurance property coverage was renewed for another year. Braishfield issued a quote that contained the P2 endorsement. The Gaineys, through Brennan, accepted the quote by sending a signed application to SLB. The 2011 application also indicated that there was a centrally monitored fire alarm on

---

[6] One of the original named insureds was Bernard Ventures, L.L.C., the owner of the property where the restaurant was located. Zydeco Corporation bought the property from Bernard Ventures, L.L.C., by a cash sale dated December 19, 2014. In 2015, the named insureds on the policy were Zydeco II, LLC and Zydeco Corporation.

[7] The other endorsement was for a burglar alarm, which was briefly mentioned throughout trial, but not the focus of the issues on appeal.

[8] Throughout the record and trial, the parties refer to the P2 endorsement as requiring a "centrally monitored fire alarm" or a "central station fire alarm." For purposes of consistency in this appeal, we used the term centrally monitored fire alarm.

the premises. Braishfield issued a binder for the policy which included the P2 endorsement. The policy was issued effective August 6, 2011 — August 6, 2012.

The renewal process was repeated every year after from 2012 through 2015. Braishfield issued a quote containing the P2 endorsement, the Gaineys signed an application attesting that there was a centrally monitored fire alarm on the premises, Braishfield issued a binder including the P2 endorsement, and the policy issued contained the P2 endorsement.

Braishfield ordered a second inspection of the insured premises in 2013. The report indicated that a centrally monitored fire alarm was "confirmed" on the premises. The inspection report also required some changes to be made to the premises and certain documentation to be provided by the insureds' fire safety systems to maintain the insurance, which insureds immediately completed.

In 2015, the policy (policy number B1180D150152) changed to name Zydeco's II, LLC and Zydeco Corporation ("Zydeco plaintiffs") as the named insureds after these entities were created by the Gaineys to own the property where the restaurant was located and operated. The 2015 policy also contained the P2 endorsement requiring a centrally monitored fire alarm and was effective August 6, 2015 through August 6, 2016.

On May 30, 2016, the restaurant was struck by lightning and it was completely destroyed by fire. Mr. Gainey immediately notified Brennan of the loss and on May 31, 2016, Brennan filed a property loss notice with SLB, which submitted the property loss notice to Braishfield. Braishfield assigned the claim to Underwriters' third-party administrator, Ms. Dianne Byrd of CJW & Associates, Inc. ("CJW") on June 2, 2016. The policy was formally rescinded by Underwriters through Braishfield on August 26, 2016, 89 days after notice of the loss.

Because multiple persons were involved in the handling and adjustment of this claim during the 89-day period prior to rescission of the policy, the testimony of key witnesses related to Underwriters' actions and/or inactions in this claim

investigation and adjustment leading to the rescission of the insureds' policy is discussed here.

## TESTIMONY AT TRIAL

### Testimony of Dianne Byrd, CJW claims adjuster

Ms. Byrd testified that CJW is a third-party claims administrator for Underwriters and admitted that Underwriters was her "one hundred percent business partner."[9] She stated that in her 26 years in the industry, this is her first rescission of a policy. Braishfield assigned her this claim on June 2, 2016.

On June 2, 2016, during her initial review of the file, Ms. Byrd noticed that the policy included the P2 endorsement. She testified she did not review any underwriting documents, nor did she recall reviewing the applications or inspection reports, or any other underwriting documents during her initial review of the claim. She immediately assigned the case to a field adjuster, Mr. Ernie Bodie, for determination of whether the premises contained a centrally monitored fire alarm. Ms. Byrd noted in her file that she sent notice to Mr. Phillip Cooper and Mr. John Barfield of Braishfield, with a "heads up on a potential large loss exposure/limits on this new claim."[10]

---

[9] Tony Hayter of Underwriters confirmed that Ms. Byrd is only allowed to adjust a claim within the guidelines set forth in the contract between CJW and Underwriters.

[10] The following e-mails were exchanged between Ms. Byrd and Mr. Cooper on June 2, 2016:

Exhibit 14: e-mail dated June 2, 2016 from Ms. Byrd to Mr. Cooper stating: "Hey Phillip, Barer of bad news again – google map [sic] the insured's address. Total burn down. Claim set up her under temp file B22. Will ackn [sic] formally shortly but wanted to give you (and John) a head's up. Sorry!!"

Exhibit 15: e-mail dated June 2, 2016 from Mr. Cooper to Ms. Byrd stating "Ugh. . ."

Exhibit 16: e-mail dated June 2, 2016 from Ms. Byrd to Mr. Cooper stating "That's what I thought you'd say!! ☹."

Exhibit 17: e-mail dated June 2, 2016 from Ms. Byrd to Mr. Cooper stating "Here is a news channels breaking news video for the new fire at Zydeco's – 59633 if you can open it." Response from Mr. Cooper "Fire – destroys – largest . . . . Not a good combination of words."

Exhibit 18: e-mail dated June 2, 2016 from Ms. Byrd to Mr. Cooper stating "Nope, not good at all!! Saw somewhere they suspect lightning. Let me know if you wish to be kept updated."

Exhibit 19: e-mail dated June 2, 2016 from Mr. Cooper to Ms. Byrd stating "Yes please keep us updated. Thanks." and Ms. Byrd's response "FYI: Insured reports he does NOT have a fire alarm system that he only had a battery operated smoke alarm inside the building that did not sound to any centralized private or public state. Coverage concern. Insured has been informed verbally of the concern per Fire Protective Safeguards endt. [sic] on the policy and he said he didn't know that one was required. I've instructed him to call his agent to discuss further as there may be some issue or error that they can get started on clarifying. But advised as soon as we receive our field adjuster's initial report with photos and a summary of the . . .

Ms. Byrd attempted to contact Mr. Gainey and left a voice-mail message for him. On June 2, 2016, Mr. Bodie met with Mr. Gainey and obtained a recorded statement from him that the premises did not have a centrally monitored fire alarm. Mr. Bodie contacted Ms. Byrd and informed her that (1) this was "an obvious total loss;" (2) the fire marshal believed the cause of the fire was lightning; and (3) Mr. Gainey stated in a recorded statement that the restaurant did not have a centrally monitored fire alarm.

Shortly thereafter, Ms. Byrd spoke with Mr. Gainey, who informed her that he "had no idea" the policy required a centrally monitored fire alarm. She acknowledged Mr. Gainey was distraught and he told her that his family and staff members were counting on him because this was their livelihood, and that this type of information was "pretty important" when it comes to good faith and fair dealing that she "does the right thing." She informed Mr. Gainey that he would need to speak with his agent to determine if there was an error regarding the centrally monitored fire alarm. Ms. Byrd was questioned about whether she should have been seeking the clarification concerning this issue, and she responded "A claims adjuster doesn't change the policy." She then acknowledged that she does not decide whether there is coverage or whether a policy should be rescinded; Underwriters decides those issues. She again stated that she informed Mr. Gainey that he should call his agent if there needed to be a policy change, and to have his agent call her if there were any changes. Initially she testified that a policy could be changed after a loss to apply retroactively, and then conceded she did not know if a change could occur under those circumstances. She acknowledged that instead of her seeking clarification from Mr. Gainey or his agent, she sent an e-mail to Underwriters inquiring how she should proceed with the claim. As a claims adjuster, she knew as of June 2, 2016 that this was an obvious total loss claim. Despite her being an

---

(FN-10 continued)
recorded statement we would be reporting to the carrier – Lloyd's, London with this coverage concern and to seek their instructions of how they wish for us to proceed."

adjuster in Louisiana and her knowledge that Mr. Gainey did not know a centrally monitored fire alarm was required, she never requested an examination of Mr. Gainey under oath. She conceded that she has requested examinations under oath of insureds on other similar cases, but did not request one here because she did not have Underwriters' "authority."

On June 3, 2016, Mr. Bodie informed her that Randy Bruff with PT&C/LWG Forensic Consulting Services conducted a cause and origin inspection on behalf of CJW. Mr. Bruff stated that he would issue a report shortly, but used a lightning report which showed lightning near the restaurant on the date of fire, and that this was consistent with the claim that lightning caused the fire.

On June 6, 2016, she received Mr. Bodie's formal report in which he reported (1) Mr. Gainey informed him that the restaurant only had battery operated smoke detectors on the premises and did not have a centrally monitored fire alarm; (2) according to the cause and origin expert, the cause of the fire appeared to be lighting, but he had not received Mr. Bruff's formal report; and (3) a building and inventory valuation of $1,228,561.86, noting that the policy limits were $900,000.00 for the building and $100,000.00 for business personal property.

On the same day, only four days after receiving the claim, Ms. Byrd reported the "new loss" with "large loss exposure" and "coverage concern" related to the P2 endorsement to Underwriters through its London agent, Decus Insurance Brokers, LTD,[11] and recommended obtaining counsel for a coverage opinion.[12] In her e-mail to Underwriters, she also submitted a proposed reservation-of-rights letter for Underwriters' approval. She acknowledged that she prepared the reservation-of-rights letter prior to receiving the cause and origin report because in her opinion, it was irrelevant as to whether there would be coverage. The London Decus agent

---

[11] Decus is a syndicate in London for Underwriters, and was one of the syndicates involved in sending information and handling this claim.

[12] She sent a copy of this report to John Barfield and Mr. Cooper of Braishfield.

forwarded the e-mail to another London agent, Owen Ludbrook, the senior claims adjuster with QBE European Operations, the lead syndicate for this claim in London for Underwriters.

Also on June 6, 2016, Mr. Gainey contacted Ms. Byrd regarding her June 3, 2016 letter. She informed him that it was a "general" automated acknowledgement letter intended to provide him with her contact information. Mr. Gainey requested to be kept informed regarding the claim. She advised him that the "large loss" and "coverage concern" was sent to Underwriters, and she recommended issuing a reservation-of-rights letter. Ms. Byrd also testified that Mr. Gainey's agent, Brennan, never contacted her.

On June 9, 2016, Underwriters, through its London Decus agent, instructed her to send the file to Henry Provosty of Provosty & Gankendorff, L.L.C., for a coverage opinion, and to issue the reservation-of-rights letter "as drafted" to the insureds. Ms. Byrd testified she mailed the reservation-of-rights letter to the insureds as instructed, and requested from Mr. Cooper the insureds' applications for "ALL years written." Upon receiving all documents from Braishfield, she sent the entire file to Mr. Provosty for a coverage opinion. She further advised the field adjuster, Mr. Bodie, of the appointment of coverage counsel and he agreed to cooperate with Mr. Provosty, if needed. She reluctantly conceded that Underwriters at that point "shut down the claims process." The claims process lasted from May 30, 2016 (date of the fire) to June 9, 2016, "give or take eleven days."

On June 13, 2016, she received Mr. Bruff's cause and origin report confirming that lightning caused the fire and classifying the fire as "an act of nature." She immediately sent the report to Underwriters through Decus, and to counsel, Mr. Provosty.

On June 20, 2016, Mr. Gainey called Ms. Byrd regarding the status of his claim. She told him that the claim was being reviewed by Underwriters' counsel and could not say how long that would take.

On July 11, 2016, Susan Allred of SLB, e-mailed Ms. Byrd regarding the claim's status on behalf of the agent, Brennan, and the insureds. Ms. Byrd responded the same day, stating that she had informed Mr. Gainey earlier that morning that they were awaiting a decision from Underwriters and its attorneys.

On July 13, 2016, Ms. Byrd learned that the 2010 inspection report contained a false finding that there was a centrally monitored fire alarm on the premises, although the insured stated there never was a centrally monitored fire alarm on the premises. She discussed this false finding with counsel for Underwriters. She testified that the inspectors made a false finding, not that Mr. Gainey made a material misrepresentation, and that the inspector "screwed up." Per her claim notes dated July 13th, Underwriters' counsel stated he would forward the information to Underwriters and request a conference call. Her notes also indicated that a conference may take place "next Wed., July 20th when I will be in the office with Lead Uwr, Owen Ludbrook."

However, when questioned at trial as to whether she met with Mr. Ludbrook in London, Ms. Byrd testified that she went to London in July of 2016 on vacation, but did not meet with anyone at Underwriters about this claim. She further testified that if Mr. Ludbrook testified that he met with her and discussed this claim, he would be incorrect. She also testified that if Mr. Hayter testified that she had a conversation with Underwriters in the summer of July 2016 about the claim, he would also be incorrect. When confronted with her claim notes dated August 2, 2016 stating she met with Mr. Ludbrook, Ms. Byrd stated that she must have been "mistaken" about her prior testimony, and that she was not trying to deceive anyone.

According to her claim notes, on July 25, 2016, Ms. Allred of SLB sent another e-mail to CJW requesting an update on the claim. As she was out of the office, Richard Walsh of CJW responded that the last note in the file was dated "07/13" stating "there was to be a conference call with the underwriters" and "[Byrd] was going to be in London and it appears she would discuss directly with them." He

stated that [Byrd] should be back at the beginning of "next week and hopefully she can communicate the underwriters' decision at that time."

By letter dated August 1, 2016, Ms. Byrd informed the insureds that Underwriters was continuing to investigate and will contact them once a determination has been made. She testified in this letter, as with others, she asked for additional information, but the Gaineys did not provide anything further to support their claim.

Ms. Byrd's August 2, 2016 claim notes showed that she met with Mr. Ludbrook and they discussed the case via conference call with Underwriters' counsel. She conceded that as of August 2, 2016, she knew rescission was a possibility. She was instructed by Underwriters to provide information to counsel for the drafting of a policy rescission letter, and to include Braishfield's response that it would not have issued the policy had it known that the premises did not have a centrally monitored fire alarm. Underwriters' counsel advised her that his office would send her a draft rescission letter "soon."

By letter dated August 5, 2016, Mrs. Gainey informed Ms. Byrd that the Parish Planning and Zoning Department had requested that they clean the premise's site, and she asked Ms. Byrd whether and when the insurance company would pay for the debris removal as stated in policy. Mrs. Gainey additionally stated, "Also, in reference to a determination, it has been over 60 days since the building burned and we have yet to know what is happening. I am asking that you give me a date as to when that determination will be made, as time is of the essence." Ms. Byrd immediately sent the letter to Mr. Ludbrook and Mr. Provosty inquiring how to respond. Ms. Byrd acknowledged that she initially told Mr. Gainey not to clean up or remove debris because they needed to investigate. She also acknowledged that Mrs. Gainey in early August had to inquire about the debris removal because they had not heard back from her or Underwriters.

12

On August 10, 2016 Underwriters approved a letter to the insureds advising them that Underwriters would issue a decision within ten business days. Ms. Byrd e-mailed the letter to the insureds and also sent it by U.S. mail. Ms. Byrd testified that she again requested additional information from the insureds but did not receive any.

Ms. Byrd's August 18, 2016 claim notes indicate that e-mails concerning counsel's draft policy rescission letter for Braishfield's signature were circulated between Underwriters, Underwriters' counsel, and herself. All parties approved the draft and it was sent to Braishfield.

By e-mail dated August 24, 2016 to Ms. Byrd, Mrs. Gainey inquired as to the claim status and the August 10. 2016 letter. Again, by e-mail dated August 25, 2016 to Ms. Byrd, Mrs. Gainey inquired as to the status of the claim. Ms. Byrd knew the rescission letter had been drafted and was awaiting instructions from Underwriters.

On August 26, 2016, Ms. Byrd received copies of the formal letter(s) rescinding the policy from Braishfield, with two separate letters addressed to each of the named insureds. In response to Mrs. Gainey's two e-mails, Ms. Byrd e-mailed her a copy of the rescission letter from Braishfield.

During her trial testimony Ms. Byrd admitted that despite her obligation of good faith and fair dealing, she did not call Mr. Gainey and inform him that the inspectors made a false finding on the 2010 inspection report because she was not authorized by Underwriters to tell him. She testified that she was also not authorized to tell the insureds that they were receiving a rescission letter because that is "not my position." Moreover, she was not authorized by Underwriters to tell Mr. Gainey that the inspection report relied upon to rescind the policy was actually false.

When questioned about whether she ever investigated the claim to address the coverage concern, *i.e.*, lack of a centrally monitored fire alarm, Ms. Byrd did not respond. Instead she stated that Mr. Gainey said there was not a centrally monitored fire alarm on the premises and she reviewed the policy upon which she determined

there was a coverage concern, and stated the coverage concern was not concerning a mistake on the application. She does not pay attention to the insurance application when reviewing a claim, but she reviews the policy. When further questioned as to whether it is her obligation to adjust the claim, make sure the insureds are treated fairly and are paid what they are owed under the policy, Ms. Byrd responded, "If it's within my authority, yes."

Ms. Byrd admitted that she did not have authority to give any information to anyone about this claim and everything she did in this case was at the direction of, as an agent of, and on behalf of Underwriters. At the time she was adjusting this claim, she conceded that she did not know the criteria under Louisiana law for rescission of a policy. She further admitted that Underwriters stopped her from adjusting the claim on June 9, 2016. She testified that she followed what she understood to be the proper claim's adjustment procedures in this case.

Ms. Byrd testified that her claim notes, about which she was questioned extensively during her trial testimony, concerned her claim activity in this case and that they were not her claim diary. When asked if her claim diary was produced to plaintiffs, she responded that it was not produced because she did not believe that it was requested.

### Testimony of Zydeco plaintiffs' agent, Dave Brennan

Mr. Brennan testified that after his initial interview with Mr. Gainey regarding the type of insurance the restaurant needed, he completed a preliminary ACORD, which requests the basic information necessary to begin securing preliminary quotes from various underwriters. He obtained all of the information for the preliminary ACORD from Mr. Gainey over the phone. He sent the preliminary ACORD to Standard Lines Brokers (SLB) and received a call from Donna Sharp with SLB. Ms. Sharp informed him that the sections on burglar and fire alarms were blank on the form, and asked if the Gaineys were going to have that type of system set up. Mr. Brennan could not remember if SLB advised him that there would be a slight

discount if those alarms were on the premises or if he asked about them.[13] He replied "I don't know. I'll call and find out." He called Mr. Gainey and "relayed to him that the underwriter is asking me if you are going to have an alarm system set up for fire and/or police department. They didn't require it."[14] He believed that Mr. Gainey had told him that he was going to get the alarm systems from ADT, not that he had them. He called Ms. Sharp back and informed her "yes, it's going to be through ADT fire and burglar," and that he would get her an alarm certificate. He testified that it was standard practice to obtain a fire alarm certificate to confirm the required alarm's presence on the premise. Ms. Sharp told him "that's not necessary. [Underwriters'] is going to do a full blown inspection and confirm everything."

Thereafter, he proceeded to the restaurant and did a "brief overview" of the application prior to the Gaineys signing. After the application was signed, he submitted it to SLB and waited for the policy to be issued. He agreed that the P2 endorsement was a condition of coverage once the policy was issued; however, he firmly testified that it was not a requirement for writing the insurance policy. Despite knowing that a centrally monitored fire alarm was required by the P2 endorsement, he admitted he never explained the P2 endorsement to Mr. Gainey, nor did he tell him that the absence of a centrally monitored alarm would void the policy because it was going to be confirmed by an inspection performed by Underwriters.

He further admitted that it was his standard procedure to go over the policy and endorsements with the insureds, but he did not do that in this case. He justified not telling the Gaineys about the P2 endorsement because he "relied on the inspection," and claimed that Underwriters did not perform a "complete inspection." Mr. Brennan further confirmed that despite his obligation to send a copy of the insurance policies to the Gaineys, he did not send the Gaineys any of the policies

---

[13] Brennan testified that it "was not the focal point. . . yes, a slight discount . . . two to three percent."

[14] Brennan believed he used the words "a fire alarm connected to . . . Something to that effect. I don't think I said central." He admitted that he never communicated to Mr. Gainey that he would be able to obtain a discount if he had the fire and burglar alarms.

containing the P2 endorsement per Mr. Gainey's request.[15]  He testified that "in hindsight" he "should have ignored what I was told and just do what I normally do."

Every year thereafter, he would bring the completed applications to the restaurant with "sticky's," inquire as to whether "everything remained, basically, the same," and the Gaineys would sign, "typically" without reviewing.

He believed the information on the applications were accurate, especially in terms of the safety systems.  He did not follow up on whether the premises had a centrally monitored fire alarm because he was told Underwriters was going to do a full inspection and confirm.[16]  Even though inspection reports stated the Gaineys confirmed the presence of the centrally monitored alarm, Mr. Brennan stated he did not "accept that it was confirmed by your inspectors.  Because you confirm by getting documented evidence."[17]  Mr. Brennan testified that verbally confirming the presence of the centrally monitored fire alarm is not "confirming in the insurance industry."  He further stated "The fact your inspectors didn't require documentation means they didn't confirm diddly.  I'm sorry, you've got to get documented evidence.  You can't just go ask that question again.  And you require it on the ones that won't void the policy.  Give me a break."[18]  He stated that the inspection reports showed that written documentation had been required for all of the safety requirements and systems as a condition to maintain the policy, *except* the P2 endorsement.  "[Underwriters] got documentation to confirm [the other safety

---

[15] Brennan's recollection was that Mr. Gainey told him "just hang on to them because I'm not going to read it."  He looked for evidence that he sent the policies.  He found documentation that he sent the general liability policy but could not state that he sent the property policy.

[16] Brennan testified that he did not request the ADT contract from the Gaineys.

[17] Brennan testified "In my experience as an insurance agent, instead of asking again if someone got it, because people are busy and they forget things, you confirm it.  You get documented evidence.  We see the shortcomings in what - - the way [Underwriters'] handled it now by not getting documentation and leading the agent, me, to think that you were.  That's the shortcomings in your process, sir."

[18] Brennan admitted to some "sloppiness" in the applications. Regarding the inspections, "I find it beyond sloppiness" as to confirmation of the fire safety systems.  He testified that he could not "get a handle on why [Underwriters'] instructed the inspectors not to get documented evidence, because they didn't get it.  They got it on everything else."

requirements and systems], except for the one [centrally monitored fire alarm] that could void the policy."[19]

Mr. Brennan testified that Mr. Gainey contacted him after the fire and inquired if he had coverage, to which he responded in the affirmative. He submitted the claim to SLB, who submitted the claim to Braishfield. Mr. Gainey contacted him after the adjusting firm told him that there was some question about coverage. He called Ms. Allred at SLB and she told him that the insurance policy for the restaurant would have been issued without a centrally monitored fire alarm. He also spoke with Keith Hinson at SLB, who confirmed that the policy would have been issued without the centrally monitored fire alarm. No one called Brennan to discuss the claim, the applications, or his involvement. He was "completely excluded" from the adjustment, investigation, or lack thereof, of this claim relative to rescission. Mr. Brennan testified that he did not have anything to do with the rescission of the policy, and did not have any communications with Underwriters, Braishfield, or Byrd relative to rescission of the policy prior to this lawsuit.

Mr. Brennan testified that he first learned of the false findings in the inspection reports after the fire and rescission of the policy. If Mr. Hayter [Underwriters] would have told him after the fire that there was a "false finding" on the inspection or that someone "dropped the ball as it related to the inspections," he would have informed the Gaineys. However, he was never told anything. Prior to this lawsuit, no one accused him of doing anything wrong or alleged that he was responsible for damage to the Gaineys. He testified that his clients were the Gaineys, but he has an agency contract with SLB, who has an agency contract with Braishfield, who has an agency

---

[19] Brennan testified that two inspections were performed of the premises and corrections were requested. In the first inspection, the inspectors wanted fire safety systems to have verification that they were updated, namely the ANSUL system needed to be serviced and fire extinguishers needed updated tags. However, written verification that there was a centrally monitored fire alarm was never requested. He stated that the "only safety system that they did not seek documentation on was the one that could void the policy. And that just baffles me." After the 2013 inspection, the Gaineys were informed that certain corrections were required, or Underwriters would cancel the policy. The Gaineys made all of the corrections required in the 2013 inspection report, and the policy was not cancelled.

agreement with Underwriters. When asked if he has a written agreement with Underwriters, he responded, "Not directly, that's correct."

Mr. Brennan further testified that he was "disturbed by the accusation of fraud, because I had the sense that [Underwriters] had not engaged in a full investigation. I felt it was somewhat arbitrary, the decision to level what is the most severe accusation against your insured that's possible without at least contacting me, the insurance agent." He testified that if Underwriters had engaged in any communication with him, he would have disclosed that he "never suspected the Gaineys, either Rose or Dustin, of any form of deception, that they are straight forward people," and that he "never suspected them of any type of fraud or deception." In his 40 plus years in the insurance industry, he could not think of one client that had his policy rescinded. He testified that despite the numerous questions asked of him regarding the application process with the Gaineys by Underwriters at trial, no one from Underwriters communicated with him prior to the rescission of the policy. He was disturbed that Underwriters had rescinded the policy because he did not believe they had conducted a full investigation. He was "very disturbed that they did not feel the need to call the agent and question me." He testified about a recent case where an insurance company suspecting fraud in a "$100,000 loss" called and questioned him in the process of due diligence before making a determination on the claim. Yet, "for a million dollar claim I don't even get a phone call. I found that somewhat arbitrary."

### *Testimony of the Gaineys*

The Gaineys testified that they were unaware that the insurance policy required a centrally monitored fire alarm and denied that they informed the inspectors that the centrally monitored fire alarm was on the premises. The Gaineys admitted that they signed the applications without reading them and did not read the policies which included the P2 endorsement.

Mr. Gainey testified that he did not know he "had to" review the applications before signing. "I paid this gentleman right here [Brennan] to do a service for me. . . . So he brings it to me. He puts it there. I give him a check. And he says 'sign here.' I sign. And I go about my day." He told Brennan about the Ansul system in the kitchen, which was already on the premises when he bought the building. He did not remember Brennan calling and specifically asking if the premises had centrally monitored fire and burglar alarms. Moreover, he was not aware that a fire alarm could be monitored. Mr. Gainey testified that Brennan never told him about the P2 endorsement or its requirement of a centrally monitored fire alarm as a condition of maintaining the policy. Mr. Gainey admitted he instructed Brennan not to send him any of the policies because he was "not going to read them." [20]

After the fire, he contacted Brennan, who told him that the premises had coverage for the fire. He met with the field adjuster on the scene, and when asked if the restaurant had a centrally monitored fire alarm, he said no. When he first spoke to Ms. Byrd, she asked him if he had a centrally monitored fire alarm and he also informed her "no." She told him that there was going to be an issue with coverage. He told her that it must be some kind of "mistake," and he did not understand. He called Brennan afterwards and explained to him what Ms. Byrd told him. Brennan was upset and told him that was not true. When Mr. Gainey received a letter from Ms. Byrd a few days later, he called her. She told him only that she would be in touch. He then received the reservation-of-rights letter from Ms. Byrd, which he did not understand. He testified that during the first month or two (1) Underwriters did not tell him that he should hire an attorney; (2) no one from Underwriters contacted him; and (3) no one told him Underwriters' attorneys were reviewing the claim. He testified that he and his wife only spoke with Ms. Byrd three times. There were other times they attempted to contact Ms. Byrd, to no avail.

---

[20] Mr. Gainey said, "Dave, I'm not going to read them. Just hold on to them for me."

When showed a letter allegedly requesting further information, Mr. Gainey replied "funny. . . [w]e tried calling them, e-mailing them and nobody answered." He testified he "kind of gave up" trying to get in touch with Ms. Byrd, but his wife continued to call and/or e-mail checking on the status of their claim. They received a letter from the parish to clean up the site. Mrs. Gainey e-mailed Ms. Byrd inquiring about the debris removal and whether it was going to be covered as provided for in the policy, but received no response from Ms. Byrd.[21] Mr. Gainey testified that he paid for the debris removal in the amount of $28,500.00 "out of my pocket." He testified that they subsequently received a letter from Ms. Byrd stating that they would receive a response in ten (10) days, which did not occur. His wife followed up by sending Ms. Byrd an e-mail on August 24th and August 25th checking on the status of the claim, to which Ms. Byrd did not respond.

Mr. Gainey testified that they received Underwriters' rescission letter on August 26, 2016. He "felt" in the letter they were calling him a "liar" and that they "just didn't want to pay the claim." He testified that from date of fire until the rescission letter, no one from Underwriters contacted him. Underwriters did not ask him about the application process with Brennan, nor did they ask whether he ever had a centrally monitored fire alarm on the building.

At trial, Mrs. Gainey testified that there was a burglar alarm system serviced by ADT on the premises. It was not activated when they moved into the Boutte location but she did reactivate it.[22] She testified that she did not renew the ADT contract after the first year because she did not believe it was necessary and she did

---

[21] Exhibits 60 & 60A: e-mail and letter from Mrs. Gainey to Ms. Byrd dated August 5, 2016 stating:

You spoke to my husband, Dustin, over 60 days ago and said it would be best not to touch the building or the building site. Our Parish Planning and Zoning Department has written a letter to us stating that the site has to be cleaned up. My question to you is the following: is the insurance company going to pay for debris removal as stated in my policy? I have additional coverage specifically for debris removal written into my policy. If so, when will that take place?

Also, in reference to a determination. It has been over 60 days since the building burned and we have yet to know what is happening. I am asking that you give me a date as to when that determination will be made as time is of the essence.

[22] Monitored burglar alarm contract dated August 5, 2010, signed by Mrs. Gainey for Zydeco.

not inform Brennan, SLB, or Braishfield that she canceled the burglar alarm because she did not know she was required to do so. She testified that Mr. Gainey handled obtaining the insurance for the restaurant from Brennan. She testified that even though she could have, she did not ask questions or review the applications prior to signing, nor did she read the verification provision on the application before signing. However, she understood by signing she was affirming that all the information was correct. She stated "If I would have known what I know today back then I would have read every single line." She agreed that it was "foolish of us not to read it." Mrs. Gainey further confirmed that there never was a centrally monitored fire alarm on the premises. She testified she never told Brennan that she objected to or requested language be deleted regarding the fire and burglar alarm endorsements because she "never knew about them."

The 2013 inspection report confirmed the presence of both alarm systems and stated that the inspector interviewed Mrs. Gainey over the phone. She testified that the premises never had a centrally monitored fire alarm and she disputed whether she had a telephone conversation with the inspector.[23] She further testified that she believed Brennan made a "mistake" in completing the initial insurance application because there was no discussion about whether the restaurant would have a centrally monitored fire alarm on the premises. Mrs. Gainey testified that they did not provide further information to Mrs. Byrd in response to the two letters.

She testified that it was unfair for Underwriters not to pay the claim. When she received the rescission letter, she did not understand because "[n]othing was ever explained." She testified that from the date of the fire until rescission of the policy, no one from Underwriters communicated with her, or asked questions about the applications or the policies or their interaction with Brennan.

---

[23] Mrs. Gainey stated "I cannot say that I did. So, I suppose I'm disputing - - I can't confirm I had a conversation."

*Testimony of Mr. Cooper of Braishfield*

Mr. Cooper is Vice President of Braishfield (wholesale insurance broker and U.S. representative of Underwriters).[24] He testified that he fully acted on Underwriters' behalf relating to this claim at Underwriters' direction or request. Other than this case, in his 10 years in the insurance industry, he has never been involved in a rescission of insurance policy.

Mr. Cooper testified that Braishfield would not have written the policy if it knew that the premises did not have a centrally monitored fire alarm. He acknowledged that a centrally monitored fire alarm is not a requirement in the contract between Braishfield and Underwriters in issuing policies for restaurants, and that Underwriters will issue a policy without a centrally monitored fire alarm. However, it is Braishfield's "standard practice with restaurants to require central station fire alarm," but acknowledged Braishfield has no written document or policy requiring the same.[25] Mr. Cooper confirmed that the reason for having fire protection requirements is because of the risk associated with kitchen fires, not the risk associated with a lightning strike. He testified that "someone" told him about this unwritten policy when he started working at Braishfield in 2012. Mr. Cooper further confirmed that Underwriters does not require an alarm certificate to issue a policy because they do inspections. They conduct inspections so they do not have to rely upon what the representation is in the application – "trust and verify."

Mr. Cooper testified that he started interacting with Underwriters regarding rescission of the policy around August 10, 2016. He confirmed that no one at Braishfield contacted the Gaineys, Brennan, or SLB after the fire to discuss the applications or investigation into the claim.

---

[24] Exhibit D-88: is Braishfield's contract as a coverholder with Underwriters. Mr. Cooper testified that binding authority occurs when the insurance carrier gives you the authority to quote businesses on their behalf within certain guidelines or boundaries provided by the insurance carrier.

[25] Exhibit 29: An e-mail dated August 2, 2016 in response to Underwriters states in effect that Braishfield would not have written the policy without a centrally monitored fire alarm.

When Braishfield was notified of the loss, it forwarded the property loss notice to its third-party claim administrator, CJW, and for any questions or other documents that were needed, he would communicate with Ms. Byrd. Mr. Cooper confirmed that CJW handles all claims adjustments on behalf of Underwriters as a third-party administrator. He further testified that other than providing documents, Braishfield at no time ever had any responsibility or obligation to conduct an investigation as it related to "coverage, rescission, denials."

Mr. Cooper testified that he did not know that the inspection company made mistakes until after the fire in this case. The 2010 inspection report contained special instructions to verify the existence of the centrally monitored fire alarm system. His understanding was that the required alarm was verified as the report stated that a centrally monitored fire alarm was "verbally confirmed." He testified that he did not think this was an issue at the time, but agrees it is an issue now. He initially learned from Ms. Byrd that the field adjuster informed her there was no centrally monitored fire alarm on the premises. Mr. Cooper testified that when Mr. Gainey said he did not have the alarm system, Underwriters "took it to be a truth." No investigation was performed on behalf of Underwriters to determine if the centrally monitored fire alarm system was there or not, Underwriters simply relied on Mr. Gainey's word. He also had discussions with Mr. Ludbrook concerning the inspection reports. In an e-mail concerning the inspections, Mr. Cooper stated that he did not see any pictures confirming the centrally monitored fire alarm. Mr. Cooper additionally testified that he did not interview the inspectors who went to the property in 2010 or 2013 prior to rescission of the policy.

Mr. Cooper sent a communication to Underwriters through the London Decus agent informing it that based on the inspection reports, there was a centrally monitored fire alarm. In the e-mail he stated that the inspection company made the misrepresentation. He further confirmed that he was aware on July 13, 2016 that there was a false finding in the inspection reports and on July 26, 2016 that there

was a misrepresentation by the inspection company. He further admitted that despite this knowledge, those facts were not included in the rescission letter sent to the insureds. The first time any real discussion occurred concerning contacting the inspectors about the false finding and misrepresentation occurred two months after the rescission of the policy.[26]

Mr. Cooper testified that he was aware of Mr. Ludbrook's testimony that it was Braishfield's decision to rescind the policy and that Braishfield, not Underwriters, rescinded the policy; he testified that this was false. He testified that Underwriters rescinded the policy and to suggest otherwise is a "fabrication."[27] Braishfield had no input in the rescission of the policy other than a legal request to change some verbiage in the rescission letter. He signed the rescission letter on his letterhead at the request of Underwriters but it was not authored by him. Although he signed the letter, he testified that he did not want to sign it because he thought the letter stated that the Gaineys committed fraud and that the inspections were good and he did not agree with those statements.[28] He agreed with plaintiffs' counsel that this was a misrepresentation to the Gaineys and said "I regret signing that letter." He further testified that he was unaware that Brennan never informed Mr. Gainey he needed to have a centrally monitored system for coverage to apply and that would be relevant if accusing Mr. Gainey of fraud. He did not know who specifically authored the letter, but he received the letter from Ms. Lena Giangrosso, attorney with Mr. Provosty's law firm and counsel for Underwriters. He testified that he acted at Underwriters' direction.

---

[26] Exhibit 36: e-mail dated October 31, 2016 requesting information about the 2013 inspection report and inspector.

[27] Exhibit 2: rescission letter stating in part:
"Underwriters have concluded that coverage does not apply to the loss at issue and the policy must be rescinded. The basis for the rescission as provided to us by the underwriters is as follows."

[28] Mr. Cooper agreed that it was a fact that the inspection "did not match reality." Braishfield was not involved in "claims handling" and he did not know what Underwriters did or did not do to determine why there were discrepancies in the inspection reports.

19-CA-562                                24

*Testimony of Plaintiffs' Expert Louis Fey*

The Zydeco plaintiffs' expert, Louis Fey, was qualified as an expert in the "field of insurance standards and practices, and claims and file adjusting." Mr. Fey testified that this case concerned whether or not an insurance carrier, Underwriters in this case, properly rescinded the insureds' insurance policy. He ultimately concluded that Underwriters did not engage in "proper claims handling" for this claim.

He testified that it was his understanding that before rescinding the policy at issue, Underwriters only took the following actions: (1) sent a field adjuster to confirm the fire to the premises caused a total loss; (2) sent an origin and cause investigator to verify lightning or natural causes was the cause of the fire to rule out arson; (3) took Mr. Gainey's statement at the scene; and (4) sent the insureds a reservation-of-rights letter.

Mr. Fey testified that when adjusting a claim, the "insured's interest are paramount. That is one thing you have to consider above all else. And you can't place the interest of an insurance company ahead of the insured." Underwriters, Braishfield, and CJW were aware internally that there was a problem with the inspections, but they did not investigate the issue. One inspection was mentioned in the rescission letter and Mr. Fey opined that Underwriters mischaracterized the inspection report and used the inspection as a basis to rescind the policy even though they knew the report was in error. He found that Underwriters did not conduct a "proper claims handling" because it failed to sufficiently investigate and failed to provide the adjuster with adequate instruction. He also found that Underwriters provided no direction and the adjuster did not proactively approach this claim to properly investigate and adjust the insureds' claim. Mr. Fey also testified that an adjuster should approach a claim with an open mind. Thus, he stated it was improper for Underwriters to control Ms. Byrd.

Mr. Fey testified that "the requirement is that you do a full, prompt, and thorough investigation immediately after receiving the claim. Any issue that is identified that requires investigation, you have to do it promptly." He testified that it is important to find out exactly what occurred between the agent and the insured when you have a coverage dispute or issue. Mr. Fey stated that the "adjuster should meet with the agent, get the agent's records, take a statement from the agent about interaction between agent and insured, meet with the insureds and obtain statements from them about the transactions, meet with the surplus lines broker and obtain information, speak with Braishfield and find out what they know."

In this case, the adjuster only requested Braishfield's file. The adjuster should have pulled the applications and if any issues existed (here alleged issues with the burglar and fire alarms), those issues should have been investigated. Mr. Fey noted that in this case, Underwriters should have met with the inspectors to determine what was or was not done, and how they confirmed a centrally monitored fire alarm was on the premises when it was not. The inspections were paid for with the insureds premiums, and Underwriters listed verification of the centrally monitored fire alarm as a special condition of the inspection. The inspection reports confirmed the presence of the required alarm but the insureds denied its presence. He stated that an investigation into the inspections two months *after* rescission of the policy was not "good claims handling practice." He testified that the e-mail from Mr. Cooper to the inspection company two months after the policy was rescinded indicates that Underwriters should have investigated those issues promptly and before it rescinded the policy. The standard is that you investigate all aspects prior to considering any denial, or in this case, rescission, which is a drastic step.[29]

---

[29] Mr. Fey stated, "And your utmost -- the utmost priority in these kinds of things is to see if there is some potential to find coverage and provide coverage for the claim. You don't want to set out on a course to find basis to rescind the policy. In this case when you have a lot of multiple errors in the application, you've got discrepancies in the loss control inspection reports. Those are things you need to look into."

19-CA-562                                                   26

Mr. Fey further testified that after a review of all the information, "a lot of mistakes were made on the part of a lot of people," and that Underwriters rescinded the policy without an investigation. Despite a lack of investigation and known errors in the inspection reports, Underwriters sent the insureds a rescission letter relying on the inspection report and accused them of intentionally misrepresenting facts on the application. He testified that Underwriters should have taken a statement of insureds under oath, and spoken with the agent and inspectors to investigate the claim prior to rescission. Underwriters should have conducted an investigation if they thought the insureds deceived them, but did not. He further testified that "with all the errors and underwriting on this file in no way you should ever consider rescission on this case."

He testified that this was an improper adjustment by Underwriters of the insureds' claim and an attempt by Underwriters to manufacture a basis for rescission. If Underwriters did what they were supposed to do with regard to a proper adjustment of this claim, they would have paid the claim within sixty days due to its own errors. "It's not like they were denying coverage based on any exclusion. They rescinded the policy based on the Gainey's [*sic*] intent to deceive. And there was no investigation in to that."

Moreover, Mr. Fey testified that the rescission letter did not deny coverage under the policy because the policy was rescinded, making the policy "nonexistent." He testified, "It is a 'you can't have your cake and eat it too' situation. You can't rescind the policy and rely upon an exclusion. The policy either doesn't exist or it does exist. . . . I don't think it's a denial asserting an exclusion it also crouches the condition as a warrant of coverage which I don't believe is the case." The rescission letter concludes with the statement that the "policy was null from it's [*sic*] inception." Mr. Fey testified, "You can't deny a claim if the policy doesn't exist."[30]

---

[30] In Mr. Fey's expert report he had an extensive list of issues that should have been investigated that were not, including that Underwriters did not state in the letter that the inspection contained a "false finding" which was a misrepresentation to the detriment of the insured.

*Testimony of Tony Hayter with Underwriters*

Tony Hayter testified that he was Underwriters' senior claims adjuster in London, that he has the most knowledge of this claim, and that he and Mr. Ludbrook made the decision for Underwriters to rescind this policy. He testified unequivocally that despite Mr. Ludbrook's testimony to the contrary, Braishfield was not involved in the decision to rescind the policy.[31] He testified that under its contract with Underwriters, Braishfield had binding authority. Braishfield only issued the rescission letter at Underwriters' request.

He also testified that the contract between Underwriters and Braishfield does not require that there be a centrally monitored fire alarm on the restaurant's premises to issue the policy. He testified that it is "not something we would insist on" and that Underwriters writes these types of policies without requiring a centrally monitored fire alarm. However, in this case, Underwriters had to rely on Braishfield when it stated that it does not write such policies without requiring a centrally monitored fire alarm, even if Braishfield's internal policy is unwritten.

Mr. Hayter testified that after reviewing the insurance policy, the applications, the inspection reports, and the claims adjuster's report, Underwriters decided to rescind the policy, *i.e.*, to say that the policy never existed. At the time, he was not aware that the inspection reports showed false findings. He also testified that he had never rescinded a policy before; this was his first case.

Mr. Hayter verified that Ms. Byrd of CJW was Underwriters' agent for the adjustment of this claim, that under its contract with Underwriters, CJW must work within the guidelines of that contract, and that CJW was obligated to adjust this claim fairly. Moreover, Mr. Hayter confirmed that Ms. Byrd acted at Underwriters' direction in adjusting this claim. He testified that "Once a claim has coverage issues, or in this case, it looks like it might be a million dollars, it's outside of her authority,

---

[31] Mr. Ludbrook testified that it was Braishfield's decision to rescind the policy, not Underwriters decision.

she needs instruction from us."[32] Mr. Hayter emphasized that Ms. Byrd did not have authority to handle this claim as she saw fit because it was a million-dollar claim.

He further confirmed that all parties/entities involved in adjusting this claim did so with Underwriters' authority. Specifically, Mr. Hayter testified that he and Mr. Ludbrook had all the decision-making responsibility in this case. He testified that Underwriters did their best to adjust this claim fairly and promptly, and conducted a thorough investigation of everything.

Mr. Hayter conceded that: (1) "There was a lot that wasn't reported that has come out this week [during the trial]" and that "this has been quite an eye opener this week;" (2) "there was a lot of information that wasn't provided that could have been provided that would have made me reconsider or could have changed my position;" (3) Underwriters did not obtain the relevant information before rescinding the policy. He also conceded that if the applications contained "mistakes," not misrepresentations, it would depend on the circumstances if Underwriters would have rescinded the policy. He then stated that even if a mistake occurred in this case, Underwriters would not have paid the claim, and that if he had to do it all over again, he would still rescind the policy.

He confirmed that the information as to how the policy was formed would have been "very important, obviously," especially that the insured did not know a centrally monitored fire alarm was required. He testified that he was aware on June 2, 2016 that the insured did not know a centrally monitored fire alarm was required. When asked if he thought it was incumbent upon Underwriters to interview Mr. Gainey under oath about those issues, Mr. Hayter replied "[t]hat isn't what we decided to do." He admitted that an examination under oath of the Gaineys could have been taken to determine intent; however, he conceded that he did not know that intent to deceive was an issue. Further, when asked if he believed it was the

---

[32] Mr. Hayter testified that without his authority, CJW only had authority to instruct someone to visit the site.

obligation of the agent and insured, not Underwriters, to determine whether there should be a clarification or steps taken to clarify the issue of intent, Mr. Hayter responded "I think it would have helped." Moreover, Mr. Hayter admitted that he did have an e-mail wherein Mr. Ludbrook stated that the inspectors "dropped the ball."[33] However, at trial he testified that the Gaineys dropped the ball and had misrepresented the facts.

Mr. Hayter agreed that the application does not contain a statement that the centrally monitored fire alarm must be on the premises for there to be coverage. He also admitted that he saw the inspection reports and several discrepancies in them before rescinding the policy. He contends he was not aware that Braishfield spoke with the inspection company after the policy was rescinded. He agreed that in the letter to rescind, Underwriters effectively accused the Gaineys of fraud, even though the letter does not use the word "fraud." He also admitted that the rescission letter did not inform the Gaineys that the 2010 inspection report, on which they were relying, contained a false finding, or that the agent or inspection company or both "dropped the ball" on this policy.

Mr. Hayter also conceded that he previously testified in his deposition that but for the rescission based upon the P2 endorsement, Underwriters would have paid the million-dollar limit in this case. However, at trial, Mr. Hayter testified that even if Underwriters had not rescinded the policy, it would have denied coverage based on the P2 endorsement. He testified that Underwriters treated the insureds fairly, and that at the time of the rescission and after hearing their trial testimony, he believed the Gaineys were "hiding or misrepresenting something and that their credibility was questionable." He testified that the Gaineys' application stated that the premises had a centrally monitored fire alarm but admitted that they never had one on the premises, and relying on the face of the applications containing their signatures,

---

[33] Exhibit 27: e-mail wherein Mr. Ludbrook states that the inspection company "dropped the ball." Mr. Hayter said the e-mail could be referring to the agent or the inspection company or both, as it is not clear who "they" is referring to, but it could be referring to the inspection company.

Underwriters had grounds to rescind the policy. Mr. Hayter conceded that Underwriters did not conduct an examination under oath of the Gaineys as to their intent, and the Gaineys never denied access to any of the inspectors in the six plus years that they were insured by Underwriters. He acknowledged that he does not know the procedures for properly handling claims in Louisiana and that Underwriters "could have handled it better if we had more information." He further admitted that he was not aware until the day of trial that Mr. C. Todd Thomas, an expert hired on behalf of Brennan, concluded that Underwriters did not properly handle this claim and that the policy should have never been rescinded.[34]

*Testimony of Keith Hinson of SLB*

Keith Hinson, an SLB senior vice president and branch manager, testified that the Zydeco plaintiffs' account was a brokerage account, meaning that SLB placed coverage with another company which was underwriting the policy. In this case it was with Braishfield. Both were wholesale general agents, and SLB had an independent contractor relationship with Braishfield.

Mr. Hinson testified that while the absence of a fire alarm makes it more difficult to place the risk, it is still an insurable risk. He was unaware of Braishfield's underwriting guidelines, but knew that wholesale general agents rely on signed applications as being true and correct and "do the inspections just to make sure." There was nothing in his file to indicate that Brennan requested any changes to remove the endorsements. He admitted that he had some interaction with this file, but Ms. Allred was the direct underwriter.[35] He testified that he was "surprised" that the policy was rescinded, and that it "seemed kind of a rash move" because he had

---

[34] Mr. Thomas was hired to determine if Underwriters had properly evaluated this claim. Mr. Thomas determined that a "mistake" occurred on the first application and as such, this policy should not have been rescinded.

[35] Ms. Allred testified that Braishfield advised her that it would have written the policy even if the Gaineys did not have a centrally monitored fire alarm. Insurers do not accept at face value an application on commercial policies. Carriers routinely have properties inspected, and when inspected properly, two options arise: either the carrier allows the insured to address the deficiencies, or they institute a 30-day cancellation. Ms. Allred testified that had Underwriters' inspections not been handled negligently, the Gaineys would either have paid more for the policy or would have had to have another company insure the property.

not seen an insurance carrier do that in the past, and the policy had been in place for six years. He testified that he did not know the details of Underwriters' investigation for this claim. Mr. Hinson agreed that if an inspector "messes up," it can be a serious problem for the insurer; and if an inspector notices a problem, it is general policy to give the insured time to correct the problem. If the insured fails to correct it, the policy is then cancelled.

### *Testimony of Underwriters' Expert Michael Brown*

Michael Brown, who was accepted as an expert in the field of general insurance for Underwriters, testified that this is "not a coverage case. The peril of lightning and resulting fire would normally be covered by that policy." This was not a coverage case because a policy cannot be denied if it does not exist. He testified that he only evaluated this case from a rescission standpoint because "this isn't about a denial of coverage," but that he is not aware of any industry standard or practice prohibiting a denial of coverage at the same time as a policy rescission.

He testified that he did not know who gave Underwriters "bad information," Brennan, the Gaineys, or both, but he concluded that the Gaineys exercised final authority over the answers by signing the applications. He testified that it is the insured's responsibility to insure that the information on the application is correct and it is the retail broker's responsibility to insure that the information on the application is correct when it is submitted. Further, it is the best insurance practice that the policy be provided to the insured, and that Brennan breached a recognized insurance standard by not providing the insureds with the policies in this case. Mr. Brown also concluded that Brennan breached a duty by not explaining the policies and endorsements to the insureds. Although he testified that Underwriters did not need to speak with Brennan, he conceded that the best practice would have been to speak to him.

Mr. Brown agreed that the application did not require a centrally monitored fire alarm as a condition of coverage. However, once the policy was issued and

Underwriters learned that the centrally monitored fire alarm was not on the premises after the fire, it was not necessary for Underwriters to contact Brennan because it had a statement by the insured that he had breached a condition of the policy. Mr. Brown testified that there were repeated misrepresentations on the applications and the Gaineys were given numerous opportunities to correct any information that had changed. Because of the repeated errors, he concluded that this was more than just a one-time mistake. Brennan checked on the application that the premises had a centrally monitored fire alarm, but the Gaineys also affirmed it.

Mr. Brown conceded that in his original expert report he did not "blame" Brennan for this incident, but after Brennan was dismissed from case, his supplemental report concluded that Brennan made errors in the process. Additionally, in the original report he did not use the phrase "intent to deceive;" he only used the term misrepresentation. He was originally asked to render an opinion as to whether rescission was proper, and he concluded that it was, without mentioning "intent to deceive." He admitted that he did not know an intent to deceive was a necessary element, but became aware after he issued his original report.

Mr. Brown's opinion was based on information given to him from Underwriters and he confirmed that some information received from Underwriters was redacted. He admitted that during trial he learned information that he was not previously provided. He contends two major pieces of information received during trial included: (1) confirmation that Braishfield would not have issued the policy without a centrally monitored fire alarm; and (2) information about the inspection reports he was not aware of at the time they were rendered.

Mr. Brown conceded that if Underwriters was responsible for hiring a "bad" inspector, and if that inspector "screws up," Underwriters would be responsible. He further conceded that the inspectors did not render correct information with regard to some parts of the inspection and agreed with counsel's words that they "screwed

up." He did not know if Underwriters actually knew that the inspectors screwed up before they rescinded the policy.

**STANDARD OF REVIEW**

A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Evans v. Lungrin, 97-541 (La. 02/06/98), 708 So.2d 731, 735; Stobart v. State, Dep't of Transp. and Dev., 617 So.2d 880, 882 (La. 1993). Where a conflict in the testimony exists, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed, even though the reviewing court may feel that its own evaluations and inferences are more reasonable. McGlothlin v. Christus St. Patrick Hosp., 10-2775 (La. 07/01/11), 65 So.3d 1218, 1231; Stobart, 617 So.2d at 882. Thus, where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989).

The issue before the reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Stobart, 617 So.2d at 882. When findings of fact are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier of fact's findings as only the fact finder can be aware of the variations in demeanor and tone of voice. Rosell, 549 So.2d at 845; Stobart, 617 So.2d at 882. The reason for the manifest error standard of review is based not only on the trial court's capacity to better evaluate live witnesses, as compared with the appellate court's access only to a cold record, but also upon the proper allocation of trial and appellate functions between respective courts. Stobart, 617 So.2d at 883.

**ASSIGNMENTS OF ERROR and ANALYSIS**

**Improper Rescission, Denial of Coverage, and Bad Faith**

In assignment of error number one, Underwriters contends that after the trial court reinstated the insurance policy, it erred in declining to reinstate the entire policy, including the P2 endorsement. Specifically, Underwriters contends the trial

court erred in setting aside the rescission of the policy but declining to enforce the P2 endorsement, which excluded coverage in this case. In its second assignment of error, Underwriters argues alternatively that even if coverage exists, the trial court erred in finding that it acted in bad faith where (a) the plain language of the P2 endorsement excluded coverage; and (b) Underwriters reasonably believed that the insureds made material misrepresentations in signing six successive insurance applications falsely claiming to have a centrally monitored fire alarm.

*Improper Rescission*

La. R.S. 22:860 governs an insurer's ability to deny coverage based upon a misrepresentation in the policy application. La. R.S. 22:860 provides:

> A. Except as provided in Subsection B of this Section, R.S. 22:1314, and 1315, no oral or written misrepresentation or warranty made in the negotiation of an insurance contract, by the insured or in his behalf, shall be deemed material or defeat or void the contract or prevent it attaching, unless the misrepresentation or warranty is made with the intent to deceive.
>
> B. In any application for life, annuity, or health and accident insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any such statement shall not bar the right to recovery under the contract unless either one of the following is true as to the applicant's statement:
>
> (1) The false statement was made with actual intent to deceive.
>
> (2) The false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer under the policy.

An insurer has the burden of proving whether an insured made material misrepresentations sufficient to rescind an insurance policy. Abshire v. Desmoreaux, 07-626 (La. App. 3 Cir. 11/07/07), 970 So.2d 1188, 1195, writ denied, 08-226 (La. 04/04/08), 978 So.2d 326. In order to void an insurance policy, an insurer must prove that (1) the insured made a false statement; (2) the false statement was material; and (3) the false statement was made with the intent to deceive. Willis v. Safeway Ins. Co. of La., 42,665 (La. App. 2 Cir. 10/24/07), 968 So.2d 346, 350; Darby v. Safeco Insurance Company of America, 545 So.2d 1022, 1026 (La. 1989).

A finding of intent to deceive is essential to defeating coverage. <u>Sims v. Maison Insurance Company</u>, 16-1661 (La. App. 1 Cir. 09/15/17), 231 So.3d 656, 659; <u>Cousin v. Page</u>, 372 So.2d 1231, 1233 (La. 1979).  Because of the inherent difficulties in proving intent, strict proof of fraud is not required to show the applicant's intent to deceive. <u>Sims</u>, 231 So.2d at 659.  An intent to deceive under La. R.S. 22:860 is determined from the circumstances, indicating the insured's knowledge of the falsity of the representations made in the application and his recognition of the materiality of his misrepresentations, or from circumstances that create a reasonable assumption that the insured recognized the materiality. <u>Cousin</u>, 272 So.2d at 1233; <u>Burley v. New York Life Ins. Co.</u>, 15-263 (La. App. 3 Cir. 11/25/15), 179 So.3d 922, 930.  Further, to prove the materiality of a false statement, the insurer must show that the statement was of such a nature that, had it been true, the insurer would either not have contracted or would have contracted only at a higher premium rate. <u>Id.</u>

Thus, in order to prove that its rescission of the policy was proper, Underwriters had to establish that (1) the plaintiffs made a misrepresentation with an intent to deceive Underwriters in order to gain coverage for the restaurant; and (2) that the misrepresentation was material.

The trial court held that Underwriters failed to meet its burden that the plaintiffs made a material misrepresentation with an intent to deceive.  The trial court specifically found:

> In a nutshell, this case turns on credibility – especially the credibility of Dustin and Rosemarie Gainey.  The Court found the Gainey's [*sic*] to be credible and believable witnesses.  The testimony of both Dustin Gainey and Rosemarie Gainey was direct, sincere, and to the point.  Their demeanor on the stand, the confidence in the rightness of their case, and their candor were something that only a trier of fact could observe.  Simply put, there is no doubt in this Court's mind that they were telling the truth.  The Court specifically finds that any mistakes they made in the application for insurance herein were honest mistakes; the Gainey's [*sic*] had no intent to defraud or deceive anyone.
>
> \*     \*     \*

Despite the reams of evidence adduced herein, the Court finds there wasn't a scintilla of evidence adduced by [Underwriters] which proved that any misrepresentation was made by the Gainey's [*sic*] with the intent to deceive. The Court finds that almost everything produced by [Underwriters] was hyperbole, argument, and innuendo.

Having carefully reviewed the record, we do not find that the trial court was manifestly erroneous or clearly wrong in finding that Underwriters did not prove that the Gaineys made a material misrepresentation with the intent to deceive under La. R.S. 22:860.[36] The record supports the finding that the Gaineys did not make a false misrepresentation with the intent to deceive. Further, if there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 883. Even if we did not agree that the record supports the finding that the Gaineys did not make a false misrepresentation with the intent to deceive, that finding by the trial court is certainly a reasonable and permissible alternative view of the evidence.

*Denial of Coverage*

On appeal, Underwriters contends that when the trial court found that rescission was improper, the trial court erred in (1) not reinstating the entire policy; and (2) not considering or addressing that the policy excluded coverage under the P2 endorsement. For the reasons that follow, we find this argument is without merit.

To the extent Underwriters contends the trial court did not consider or address its claim that the policy denied coverage under the P2 endorsement, we find this argument is without merit. When a judgment is silent as to a claim or demand that was litigated, it is presumed to be deemed denied by the trial court. Mason v. Bankers Ins. Group, 13-704 (La. App. 5 Cir. 01/31/14), 134 So.3d 29, 36. The reasons for judgment do not specifically address this claim, but the record shows that the issue was fully litigated, thus it is presumed the trial court denied this claim.

---

[36] While Underwriters did not appeal the trial court's finding that rescission of the policy was improper, discussion of the improper rescission is necessary in regards to Underwriters' claim concerning bad faith damages.

Further, we find that the trial court's reasons for judgment are not controlling and do not constitute the judgment of the court. Dufresne v. Dufresne, 10-963 (La. App. 5 Cir. 05/10/11), 65 So.3d 749, 754. Appellate courts examine *the result* of the judgment rather than the reasons. Id. (Emphasis added.) Here, the reasons for judgment do not specifically address the denial of coverage claim, but the reasons do mention that "After the fire, [Underwriters] rescinded the policy from its inception (*rather than denying the claim*), resulting in the instant litigation." (Emphasis added.) Regardless of the trial court's stated reasons, we find the record shows that the trial court considered and rejected Underwriters' assertion that it had denied coverage based on the P2 endorsement.

Underwriters argues that if an insurer fails to show that rescission is proper, the policy, including all terms, conditions, and exclusions, remains in full force. Thus, Underwriters contends it had a right to defend against coverage based on the condition and exclusion in the P2 endorsement. The terms of the P2 endorsement required a centrally monitored fire alarm as a condition of coverage and Underwriters, therefore, had the right to exclude coverage in this case based on the Zydeco plaintiffs' failure to have a centrally monitored fire alarm.

An insurance policy constitutes the law between the insured and insurer and the extent of coverage is determined from the intent of the parties as reflected by the terms of the insurance policy. City of Kenner v. Certain Underwriters at Lloyd's, 15-351 (La. App. 5 Cir. 12/30/15), 183 So.3d 812, 815. Underwriters, citing Perault v. Time Ins. Co., 633 So.2d 263 (La. App. 1 Cir. 1993), contends it has a right to deny coverage based on the terms of the policy without regard to whether plaintiffs misrepresented information.

The insurer bears the burden of proving that a loss falls within a policy exclusion. Supreme Services and Specialty Co., Inc. v. Sonny Greer, Inc., 06-1827 (La. 05/22/07), 958 So.2d 634, 639. In this case, Underwriters argues that coverage was clearly eliminated as Mr. Gainey testified that the premises never had a centrally

monitored fire alarm. Underwriters claim that because there is no coverage, there can be no bad faith denial of coverage and the exclusion requires a complete reversal in its favor, mooting all remaining issues in this appeal.

Underwriters further contends that the Zydeco plaintiffs breached a condition precedent of the P2 endorsement. La. R.S. 22:1314 allows an insurer to deny coverage when an insured has breached a condition contained in a fire insurance policy if the condition (1) existed at the time of the loss, and (2) is of the type that would increase either the moral or physical hazard under the policy. Underwriters contends the burden was on the Zydeco plaintiffs to prove that they satisfied the condition precedent, which they did not because Mr. Gainey admitted the premises never had a centrally monitored fire alarm. Thus, on this additional basis, Underwriters argues there was no coverage, without which, there could be no bad faith denial. Underwriters thereby seeks reversal of the entire judgment.

The record supports the trial court's finding that this is a case concerning damages caused by an unlawful rescission of the policy, not an obligation to pay or not pay policy limits under the terms, conditions, and exclusions of the policy. While Underwriters argues that it denied coverage under the policy terms and La. R.S. 22:1314, *and* rescinded the policy based on misrepresentations under La. R.S. 22:860, the law and evidence established otherwise. It is undisputed that Underwriters rescinded all policies and returned the premiums. Because the policy was rescinded *ab initio* based on misrepresentation, the policy did not exist for Underwriters to allegedly simultaneously deny coverage under the terms, conditions, and/or exclusions of the policy.

The uncontroverted testimony and evidence at trial established that this case concerned the rescission of the insurance policy and the damages which resulted from the improper rescission during the 89-day period prior to rescission, *not* from a denial of coverage based on the P2 endorsement and/or La. R.S. 22:1314. Plaintiffs' expert, Louis Fey, testified "It's not like they were denying coverage

based on any exclusion. They rescinded the policy based on the Gainey's [*sic*] intent to deceive. And there was no investigation in to that." He testified that he did not believe that the rescission letter stated that Underwriters was also denying coverage under the policy. In this case, Underwriters rescinded the policy which made the policy "nonexistent." He further testified "It is a you can't have your cake and eat it too situation. You can't rescind the policy and rely upon an exclusion. The policy either doesn't exist or it does exist." He pointed out that the rescission letter stated in conclusion that the "policy was null from it's [*sic*] inception."

Underwriters' expert, Mr. Brown, agreed that this is "not a coverage case. The peril of lightning and resulting fire would normally be covered by that policy." He further agreed that this was not a coverage case because a policy cannot be denied if it does not exist. He testified that he only looked at this from a rescission standpoint because this isn't about a denial of coverage. This is supported by the trial court's reasons for judgment stating "After the fire, [Underwriters] rescinded the policy from its inception (*rather than denying the claim*) resulting in the instant litigation." (Emphasis added.)

Thus, the evidence supports the trial court's rejection of Underwriters' claim that it denied coverage under the terms of the policy and La. R.S. 22:1314 *and* rescinded the policy. It is uncontroverted that the plaintiffs filed this case seeking damages sustained based on an improper rescission of the policy, not a denial of coverage. As such, we find the trial court was not manifestly erroneous in resolving this case based on whether rescission was proper and whether the Zydeco plaintiffs sustained damages as a result of the improper rescission, not an alleged denial of coverage under the P2 endorsement and/or La. R.S. 22:1314.

Nevertheless, we will address whether Underwriters waived its right to deny coverage once the trial court found that the policy was improperly rescinded.

La. R.S. 22:1314 provides:

A. No policy of fire insurance issued by any insurer on property in this state shall hereafter be declared void by the insurer for the breach of any representation, warranty, or condition contained in such policy or in the application therefor. Such breach shall not allow the insurer to avoid liability *unless such breach: (1) exists at the time of the loss, and be such a breach as would increase either the moral or physical hazard under the policy*; or (2) shall be such a breach as would be a violation of a warranty or condition requiring the insurer to take and keep inventories and books showing a record of his business.

B. Notwithstanding the provisions of Subsection A of this Section, such a breach *shall not afford* a defense to a suit on the policy *if the facts constituting such a breach existing at the time of the issuance of the policy and were, at such time, known to the insurer or to any of his or its officers or agents*, **or** *if the facts constituting such a breach existed at the time of the loss and were, at such time, known to the insurer or to any of his or its officers or agents*, except in case of fraud on the part of such officer or agent or the insured, or collusion between such officer or agent and the insured. (Emphasis added.)

Waiver is the intentional relinquishment of a known right, power or privilege, which occurs when there is an existing right, a knowledge of its existence, and an actual intention to relinquish it or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished. Tate v. Charles Aguillard Ins. & Real Estate, Inc., 508 So.2d 1371, 1373-74 (La. 1987).

In Tate, the Louisiana Supreme Court addressed the limits of waiver concluding:

Waiver may apply to any provision of an insurance contract under which the insurer knowingly and voluntarily elects to relinquish his right, power or privilege to avoid liability, even though the effect may bring within coverage risks originally excluded or not covered. Of course, reliable proof of such knowing and voluntary waiver is necessary and the burden of producing it, as in the proof of obligations, generally falls on the party who demands performance.

Tate, 508 So.2d at 1375.

Notice of facts which would cause a reasonable person to inquire further imposes a duty of investigation upon the insurer, and failure to investigate constitutes a waiver of all powers or privileges which a reasonable search would have uncovered. Swain for and on behalf of Swain v. Life Ins. Co. of Louisiana,

537 So.2d 1297, 1304 (La. App. 2 Cir. 1989), writ denied, 541 So.2d 895 (1989); see also, Foret v. Terrebonne Towing Co., Inc., 632 So.2d 344, 347 (La. App. 1 Cir. 1993).

Underwriters, through Braishfield, inspected the property in 2010 and 2013. The inspectors had specific instructions to verify the presence of a centrally monitored fire alarm on the premises. Both inspection reports confirmed the presence of a centrally monitored fire alarm. In 2010, the report stated that Mr. Gainey "verbally" confirmed a centrally monitored fire alarm and in the 2013 report, the inspector noted an interview with Mrs. Gainey and "confirmed" the presence of a centrally monitored fire alarm. Underwriters was given unfettered access to inspect the property, even when the Gaineys were not present for the second inspection. No documentation was obtained at either inspection to verify the presence of a centrally monitored fire alarm, even though the inspectors required actual documentation to verify other fire safety requirements. Thereafter, Underwriters continued to insure the property and accept premiums for six years.

Immediately after the fire Underwriters was informed by Mr. Gainey that the premises never had a centrally monitored fire alarm and Mr. Gainey further stated that he did not know that a fire alarm could be monitored. Brennan testified that it is standard practice for an insurer to obtain a certificate of compliance to show that there is a properly working centrally monitored fire alarm. He advised Underwriters that he would obtain a certificate at the time the application was submitted, but was informed that this was not necessary because Underwriters would conduct a full inspection of the property. Underwriters conducted the inspections, finding other deficiencies that required the Zydeco plaintiffs to correct to maintain coverage, but confirmed the presence of the centrally monitored fire alarm without requiring documentation or correction.

It was undisputed that the inspectors were given unfettered access to the premises without the Gaineys on the premises during the second inspection. The

Zydeco plaintiffs could not have misrepresented or deceived Underwriters as to the presence of a centrally monitored fire alarm if their inspectors were able to inspect the property without the Gaineys present. Mr. Gainey testified, and it is undisputed, that the premises never had a centrally monitored fire alarm. It is further uncontested that the inspectors were hired by Underwriters, through Braishfield. After two inspections, Underwriters accepted the premises "as is" when it continued to renew the Zydeco plaintiffs' insurance policies and accept premiums for six years.

On July 13, 2016, Ms. Byrd discovered that the inspection reports contained a false finding, *i.e.*, the presence of a centrally monitored fire alarm when Mr. Gainey stated that the premises never contained the required alarm. Ms. Byrd advised legal counsel, and discussed the false findings with Mr. Ludbrook in London with counsel present during a conference call regarding the faulty inspections. Mr. Ludbrook sent an e-mail to Mr. Gilles, the London Decus agent, one month before rescinding the policy, requesting Mr. Gilles to check with Braishfield to inquire as to whether or not the inspection firm used for this insured "regularly inspected properties claiming that they have alarm systems in place when in fact they do not."

Thus, prior to rescinding, Underwriters was aware that its inspectors had certified a centrally monitored fire alarm on the premises when there was none. When a carrier is reasonably aware of a defense to coverage and continues to renew the policy with no notice to the insured, as if the defense does not exist, then that defense is waived. Steptore v. Masco Const. Co., Inc., 93-2064 (La. 08/18/94), 643 So.2d 1213, 1216. The evidence shows that Underwriters' inspectors had reason to be aware of the absence of a centrally monitored fire alarm, yet nonetheless provided coverage in its absence. Underwriters continued to accept premiums and renew this policy for six years after inspecting the property.

Furthermore, Underwriters and its claims adjuster became aware of the false findings in the inspection reports, prior to rescinding the policy, and Underwriters intentionally elected not to inform the insureds about the false findings and faulty

inspection reports. Moreover, Underwriters failed to perform any investigation concerning the inspection reports while knowing that the reports contained false findings. Under Swain, supra, Underwriters had a duty to investigate the faulty inspection reports to determine what effect, if any, the faulty inspection reports had on coverage. Instead, Underwriters used the faulty inspection reports as a basis for policy rescission.

Underwriters' argument that it denied coverage is also without merit. "When an insurer chooses to deny coverage to an insured in reliance on a legal or factual defense which investigation would prove to be unsubstantial, the insurer will be held liable for statutory penalties." Swain, 537 So.2d at 1304. Underwriters waived its defense under La. R.S. 22:1314 that the Zydeco plaintiffs misrepresented that an alarm was present.

### *Bad Faith and Penalties*

Underwriters contends that regardless of whether rescission was proper, it had a good faith basis to believe that the Zydeco plaintiffs made a material misrepresentation and that coverage was eliminated under the P2 endorsement. Thus, Underwriters argues that the trial court was clearly wrong in finding that it was in bad faith and awarding penalties.

In order to establish a cause of action for penalties and attorney fees under La. R.S. 22:1892; a claimant must show that (1) an insurer has received satisfactory proof of loss; (2) the insurer failed to tender payment within thirty days of receipt thereof; and (3) the insurer's failure to pay is arbitrary, capricious or without probable cause. La. R.S. 22:1892; Guillory v. Lee, 09-75 (La. 06/26/09), 16 So.3d 1104, 1126; Louisiana Bag Co., Inc. v. Audubon Indem. Co., 08-453 (La. 12/02/08), 999 So.2d 1104, 1112-1113. Similarly, La. R.S. 22:1973 provides that an insurer owes to his insured a duty of good faith and fair dealing, which includes an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured. La. R.S. 22:1973. An insurer who breaches those

duties is liable for damages sustained as a result of that breach.  Id.  The statute further provides that a breach includes the failure to pay an amount due to the insured within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.  Id.

The question of arbitrary and capricious behavior is a factual issue, and the trial court's finding should not be disturbed on appeal absent manifest error. Guillory, 16 So.3d at 1127; Sher v. Lafayette Ins. Co., 07-2441 (La. 04/08/08), 988 So.2d 186, 207.  The purpose of La. R.S. 22:1982 and La. R.S. 22:1973 is to "provide remedies to insureds whose insurance claims are improperly handled or to whom payment is unreasonably delayed." Lee v. Sapp, 17-490 (La. App. 4 Cir. 12/06/17), 234 So.3d 122, 128, writ denied, 18-44 (La. 03/02/18), 269 So.3d 709.

Both La. R.S. 22:1982 and La. R.S. 22:1973 require proof that the insurer was "arbitrary, capricious, or without probable cause," a phrase that is synonymous with "vexatious."   Sher, 988 So.2d at 206; Louisiana Maintenance Services, Inc. v. Certain Underwriters at Lloyd's of London, 616 So.2d 1250, 1253 (La. 1993).  The "vexatious refusal to pay" means unjustified, without reasonable or probable cause or excuse. Sher, 988 So.2d at 206; Louisiana Maintenance Services, Inc., 616 So.2d at 1253.  Both phrases describe an insurer whose willful refusal of a claim is not based on a good-faith defense.  Sher, 988 So.2d at 206-207.   When there are substantial, reasonable, and legitimate disputes as to the extent of an insurer's liability or an insured's loss, the insurer's failure to pay within the statutory period is not arbitrary, capricious, or without probable cause.  Louisiana Bag Co., Inc., 999 So.2d at 1114.  Thus, statutory penalties are inappropriate when the insurer has a reasonable basis to defend the claim and acts in good-faith reliance on that defense. Reed v. State Farm Mut. Auto. Ins. Co., 03-107 (La. 10/21/03), 857 So.2d 1012, 1021.  This is especially true where there is a reasonable and legitimate question as to the extent and causation of a claim; bad faith should not be inferred from an

insurer's failure to pay within the statutory time limits when such reasonable doubts exist. Reed, 857 So.2d at 1021; Louisiana Bag Co., Inc., 999 So.2d at 114.

Whether or not a refusal to pay is arbitrary, capricious, or without probable cause depends on the facts known to the insurer at the time of its action. Sher, 988 So.2d at 207; Louisiana Bag Co., Inc., 999 So.2d at 1114.

One who claims entitlement to penalties and attorney fees has the burden of proving the insurer received satisfactory proof of loss as a predicate to a showing that the insurer was arbitrary, capricious, or without probable cause. Reed, 857 So.2d at 1020. "Satisfactory proof of loss" is that which suffices "to fully apprise the insurer of the insured's claim." La Louisiane Bakery Co., Ltd. v. Lafayette Ins. Co., 09-825 (La. App. 5 Cir. 02/08/11), 61 So.3d 17, 35, writ denied, 11-493 (La. 04/25/11), 62 So.3d 95; McDill v. Utica Mut. Ins. Co., 475 So.2d 1085 (La. 1985).

The trial court found that the Zydeco plaintiffs sustained damages as a direct result of Underwriters' decision to rescind the policy. The trial court found:

> The bottom line is that [Underwriters] unlawfully and improperly rescinded the insurance policy, [Zydeco plaintiffs] sustained substantial damages as a result of this improper rescission and their actions constitute bad faith under Louisiana law.

The evidence supports the trial court's finding of bad faith by Underwriters based on Underwriters' conduct throughout the 89-day period from the date of the fire to rescission of the policy. Underwriters was arbitrary, capricious, and without probable cause in its adjustment of the Zydeco plaintiffs' claim during the 89 days prior to rescission of the policy.

The insurer is required to take substantive and affirmative steps to accumulate the facts necessary to evaluate a claim. Guillory, 16 So.3d at 1114. Plaintiffs' expert Mr. Fey testified that when you are "investigating something as drastic as a rescission on a million dollar fire," you have "to leave no stone unturned." Mr. Fey testified that prior to rescission, Underwriters should have (1) taken an examination under oath of the insureds; (2) interviewed the insureds' agent; and (3) interviewed

the inspectors or someone at the inspection company. He testified that in reviewing the matter, he found that "when there was anything favorable to the Gaineys it was buried and not considered and not mentioned," such as the numerous discrepancies found on the applications. Mr. Fey testified that from an adjustment claims perspective, each claim needs to be approached with an open mind, and that you cannot infer anything into the investigation. The investigation is conducted to uncover facts. He testified that if an insurer had to prove intent, such as in this case under La. R.S. 22:860, it is necessary to investigate and take steps that will result in the discovery of those facts. Mr. Fey testified that in this case, Underwriters made a determination as to intent without doing an investigation, and in the rescission letter accused the Gaineys of intent to deceive. He further testified there was improper claim adjustment here and "with all the errors and underwriting on this file in no way you should ever consider recission [*sic*] on this case." Mr. Fey testified that he thought "it was an attempt to manufacture a basis for recission [*sic*]."

Mr. Hayter's testimony indicates Underwriters failed to investigate. Mr. Hayter testified that he learned new facts at trial that would have been helpful in making the decision as to whether or not he should have rescinded the policy. He confirmed that Underwriters never spoke to anyone about this claim prior to the decision to rescind. The trial court held:

> Call it bad corporate policy in the adjusting and investigation of this claim (if such a policy exists), bad judgment, or bad advice – the bottom line is the actions of [Underwriters] resulted in the ruin of a business which depended on the good faith of its insurer to protect it from loss. There was no good faith here.

"An insurer's refusal to pay can be found to be not 'without just cause' even though its defense is not subsequently upheld in court." Bertrand v. Protective Life Ins. Co., 419 So.2d 1254, 1260 (La. App. 3 Cir. 1982); see also Darby v. Safeco Ins. Co. of Am., 545 So.2d 1022, 1029 (La. 1989). Underwriters contends it had a good-faith basis to believe that the insureds made material misrepresentations in their applications. Thus, Underwriters contends that a finding that the Gaineys did not

intend to deceive does not mean that Underwriters was unreasonable in believing otherwise. Furthermore, Underwriters contends that its decision not to contest this finding does not deprive it of the right to contest the imposition of penalties and attorney fees. Underwriters argues that it had ample evidence to believe that it had grounds to rescind the policy because the Gaineys signed six successive applications attesting to the presence of a centrally monitored fire alarm and received the quotes, binders and policies for each year, all of which stated that the centrally monitored fire alarm was required for coverage. Additionally, Underwriters had the 2010 inspection report stating that Mr. Gainey "verbally verified" the presence of a centrally monitored fire alarm on the premises and a 2013 inspection report stating that the inspector interviewed Mrs. Gainey and "confirmed" the presence of the required alarm. With the advice of Louisiana coverage counsel, Underwriters contends it was reasonable in reaching the conclusion that the Gaineys misrepresented the presence of a centrally monitored fire alarm.

We find the trial court was not manifestly erroneous or clearly wrong in finding that Underwriters was in bad faith by concluding that the Gaineys misrepresented the presence of a centrally monitored fire alarm. Underwriters knew on June 2, 2016 that Mr. Gainey stated he had "no idea" that a centrally monitored fire alarm was required and that there was never that type of fire alarm on the premises. Also, Underwriters knew as early as July 13 and 20, 2016 that the inspection reports contained false findings, yet Underwriters made no attempt to contact the inspection company or inspectors until two months *after* it rescinded the policy. Moreover, the evidence shows that Underwriters stopped adjusting the claim on June 9, 2016 when the claim's file was sent to legal coverage counsel. Despite this knowledge, Underwriters took no action to investigate. Instead, Underwriters relied on the prior applications signed by the Gaineys stating there was a centrally monitored fire alarm and the subsequent policies that were issued to support a finding of intent to deceive.

Specifically, Underwriters' failure to disclose the false finding in both the 2010 and 2013 inspection reports also supports a finding of bad faith. In its rescission letter to the insureds, Underwriters mentioned the 2010 inspection report and that Mr. Gainey verbally confirmed the presence of the alarm but did not state that the report contained a false finding. Moreover, Underwriters failed to disclose the 2013 inspection report wherein the inspector was given unfettered access to the property to confirm the presence of the required alarm without the Gaineys present. Although both reports show that the inspectors incorrectly confirmed the presence of a centrally monitored fire alarm, Underwriters blamed the Gaineys for confirmation of the centrally monitored fire alarm in the rescission letter. However, on close review of the evidence, it is clear that Underwriters actually blamed the inspection company for the faulty inspection. Mr. Fey cited the omission of the 2013 inspection report from the rescission letter as one example of the Underwriters concealing information helpful to its insureds. Mr. Cooper testified that the faulty inspection reports should have been disclosed to the insureds. We find these actions/inactions by Underwriters constitute a violation of Underwriters' affirmative duty of good faith and fair dealing with the insureds. The evidence shows that Underwriters was not reasonable in concluding the Gaineys made a material misrepresentation with the intent to deceive as they did no investigation into the absence of the centrally monitored fire alarm, even though they were aware that Mr. Gainey had "no idea" that it was required.

Underwriters' claims handling in this case also supports a bad faith finding. La. R.S. 22:1973 provides that an insurer has an affirmative duty to adjust claims fairly and promptly. The testimony established that Underwriters "shut down" the claims adjustment process eleven days after the fire.

The fire occurred on May 30, 2016 and resulted in a total loss of the property. A property loss notice was submitted on May 31, 2016. The claim was assigned to Underwriters' third-party administrator, Ms. Byrd, on June 2, 2016. The same day,

she (1) engaged in an e-mail exchange with Mr. Cooper concerning the large loss claim, including news video of the fire; (2) reviewed only the policy, noticing the P2 endorsement; (3) sent field adjuster, Mr. Bodie, to the site and requested a determination as to whether the premises contained a centrally monitored fire alarm; (4) was informed by Mr. Bodie that the claim was a total loss and obtained Mr. Gainey's statement that the premises never had a centrally monitored fire alarm; and (5) spoke with Mr. Gainey who said he "had no idea" that a centrally monitored fire alarm was required.

On June 4, 2016, Ms. Byrd sent Underwriters a report stating that the premises never had a centrally monitored fire alarm and recommended Underwriters obtain a coverage opinion from counsel. She also prepared and enclosed for approval a reservation-of-rights letter regarding the P2 endorsement. After this, Ms. Byrd instructed the field adjuster to "not engage the insured," because she was going to "sit and wait" for Underwriters to tell her what to do next.

On June 9, 2016, Underwriters approved Ms. Byrd's reservation-of-rights letter and told her to send it to the insureds. Underwriters further advised her to obtain all the necessary documents from Braishfield and send those documents along with her file to counsel for a coverage opinion. Ms. Byrd testified at that point, eleven days after the fire, Underwriters shut down the claims adjustment process.

Mr. Gainey testified, and Ms. Byrd confirmed, that after the June 9, 2016 reservation-of-rights letter was sent to the insureds, Ms. Byrd took no further action in adjusting this claim. On August 2, 2016, Ms. Byrd knew that Underwriters was discussing rescinding the insurance policy. From June 9, 2016 to August 5, 2016, Ms. Byrd took no action to update the insureds and withheld critical information from them. On August 5, 2016, Mrs. Gainey e-mailed Ms. Byrd advising that the parish was requesting the Gaineys clean up the site and asked if Underwriters was going to pay for the debris removal, which was covered by the policy. In Mrs. Gainey's e-mail she stated, "It has been 60 days since the building burned and we

have yet to know what is happening." By letter dated August 10, 2016, Underwriters responded to the Gaineys informing them that a "formal response for position on coverage for the above captioned claim shall be issued within the next ten business days." In this letter, Underwriters withheld critical information that it had already decided to rescind the policy. In addition, Underwriters did not respond within 10 business days. Mrs. Gainey sent e-mails on August 24th (10th day) and August 25th (11th day) inquiring as to the status of the claim. Underwriters finally sent a formal response, the rescission letter, to the insureds on August 26, 2016, three weeks after it had already decided to rescind the policy and well past the 30-day requirement. Ms. Byrd only responded to Mrs. Gainey's e-mails thereafter by attaching a copy of the rescission letter.

The actions and inactions of Underwriters show that it failed to communicate with the insureds and withheld vital information from them regarding their claim in violation of its affirmative duty to act in good faith and to deal fairly with its insureds.

At trial, several witnesses testified that they disagreed with the decision to rescind the policy. Brennan testified that the decision was disturbing and arbitrary. Mr. Hinson testified that he was surprised by the decision and that it was rash. Ms. Allred testified that she was surprised and upset that it occurred. Mr. Fey testified that rescission should have never been considered in this case. Mr. Cooper, who signed the rescission letter, testified that he did not want to sign the letter. Underwriters made no attempt to speak with any individuals connected with the claims process in order to discern what occurred and if it would affect coverage or rescission.

We conclude that the trial court was not manifestly erroneous in finding that Underwriters' bad faith was related to its actions and inactions *prior to* rescinding the policy, and did not err in awarding the Zydeco plaintiffs penalties for Underwriters' bad faith. Based on the evidence, Underwriters rescinded the policy

and returned the premiums ─ it did not deny coverage. As Mr. Fey stated at trial, "You can't deny a claim if the policy doesn't exist." Underwriters based its decision to rescind the policy upon an alleged material misrepresentation by the insureds with an intent to deceive in violation of La. R.S. 22:860.

Upon review of the record, Underwriters failed to fairly and promptly investigate whether there was a material misrepresentation by the insureds and whether there was an intent to deceive. The evidence showed that Underwriters failed to do any investigation. Underwriters relied solely on signed applications for insurance which conflicted with Mr. Gainey's testimony that the premises never had a centrally monitored fire alarm and that he "had no idea" such an alarm was required. Underwriters did not interview Mr. Gainey or examine him under oath nor did Underwriters interview the insureds' agent, Brennan, or any of the other brokers who were involved in obtaining the policy. Moreover, after receiving the claim, Underwriters did not communicate with the insureds, withheld favorable information from the insureds, and shut down the claims adjustment process eleven days after the fire without investigating the claim as to the alleged material misrepresentation and intent to deceive. Because Underwriters was aware that there was never a centrally monitored fire alarm on the premises and that Mr. Gainey had "no idea" one was required, and was further aware that the 2010 inspection report contained a false finding, Underwriters was required to take substantive and affirmative steps to accumulate the facts necessary to evaluate the claim. Despite these conflicts and its knowledge that the fire caused a total loss to the insureds' property, Underwriters stopped adjusting the claim only 11 days after the fire. All of these bad faith actions caused the insureds' damages.

Accordingly, we find the trial court was not manifestly erroneous or clearly wrong in finding that (1) Underwriters' August 26, 2016 rescission of policy D1180D150152-59633 was improper; (2) Underwriters violated its duties of good faith and fair dealing in the investigation and adjusting of the May 30, 2016 fire loss

in violation of La. R.S. 22:1973; (3) Underwriters failed to pay the Zydeco plaintiffs' claim within 30 days of receiving satisfactory proof of loss in violation of La. R.S. 22:1892; and (4) as a result of Underwriters' improper rescission of the policy and violations of La. R.S. 22:1973 and La. R.S. 22:1892, the Zydeco plaintiffs sustained damages and are entitled to statutory penalties.

**Awards and Penalties**

In assignment of error three, Underwriters contends that the trial court committed legal error in calculating damages by (a) awarding $1,228,561.86 for loss of the building, well over the $900,000 policy limit; (b) awarding penalties based not only on the damage sustained as a result of alleged bad faith conduct, but also on the damage caused by the fire; (c) awarding excessive bad faith damages for lost income, adding to the penalty's excessiveness; and (d) awarding bad faith damages caused not by appellant's breach of the penalty statute, but rather by the negligence of settling defendants and by plaintiffs themselves.

*Damages for loss of building*

An insurance policy is a contract between the parties and should be construed using the general rules of interpretation set forth in the Civil Code. Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co., 93-911 (La. 01/14/94), 630 So.2d 759, 763. An insurance policy should not be interpreted in an unreasonable or strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. Id.

In the absence of conflict with a statute or public policy, insurers have the same rights as individuals to limit their liability and impose whatever conditions they desire upon their obligations. Cadwallader v. Allstate Insurance Co., 02-1637 (La. 06/27/03), 848 So.2d 577, 583. The insurance policy establishes the limits of liability, and that policy is the law between the parties. Sims v. Mulhearn Funeral Home, Inc., 07-54 (La. 05/22/07), 956 So.2d 583, 595; Cadwallader, 848 So.2d at 583. When we find that the provisions of the policy are clear and unambiguous, we

must enforce the policy as written. La. C.C. art. 2046; <u>Hill v. Shelter Mutual Insurance Co.</u>, 05-1783 (La. 07/10/06), 935 So.2d 691, 694; <u>Peterson v. Schimek</u>, 98-1712 (La. 03/02/99), 729 So.2d 1024, 1028.

Upon review, the policy in effect on the date of the fire clearly limits Underwriters' exposure for "direct physical loss" of the building to a maximum of $900,000.00 and $100,000.00 for business personal property. Under the clear and unambiguous terms of the policy, the trial court was limited to awarding the maximum of $900,000.00 for loss of the building and $100,000.00 for business personal property under the policy. Thus, the trial court erred in awarding the Zydeco plaintiffs $1,228,561.86 for the loss of the building and business personal property, because it exceeded policy limits. The evidence supports a finding that the fire caused a total loss of the building and contents, and no evidence was introduced to controvert this fact. Accordingly, we amend the judgment and award the Zydeco plaintiffs $900,000.00 for loss of the building and $100,000.00 for business personal property under the policy.[37]

### *Damages for lost income for loss of business*

Underwriters argues that if the Zydeco plaintiffs are entitled to penalties for bad faith, the trial court's award of $4,900,000.00 in damages for lost income is grossly excessive. Underwriters contends that lost income was discussed by the Zydeco plaintiffs' expert, Stuart Wood, and Underwriters' expert, Ralph Litolff. Underwriters further argues that both experts used the same business-valuation model, but that only Mr. Litolff used actual data to project a lost income of $781,000.00 for the Zydeco plaintiffs' loss of business, as opposed to Mr. Wood's "baseless assumptions" used to opine a lost income of $4,900,000.00. Underwriters contends that the trial court was manifestly erroneous in accepting and awarding lost income to the Zydeco plaintiffs in the amount of $4,900,000.00.

---

[37] The trial court also awarded the Zydeco plaintiffs damages in the amount of $28,500 for debris removal. Underwriters did not appeal this award.

The trial court's determination as to credibility in the evaluation of expert testimony should not be disturbed, unless the stated reasons of the expert are patently unsound. Lirette v. State Farm Ins. Co., 563 So.2d 850, 853 (La. 1990). Credibility determinations, including the evaluation of and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact, which should not be disturbed on appeal in the absence of manifest error. Lasyone v. Kansas City Southern R.R., 00-2628 (La. 04/03/01), 786 So.2d 682, 693.

The record supports the trial court's use of Mr. Wood's calculations instead of Mr. Litolff's in determining damages for the Zydeco plaintiffs' lost income. However, based on Mr. Wood's testimony, we find that the trial court was manifestly erroneous in awarding $4,900,000.00 for lost income. Mr. Wood testified that more probable than not the value of the Zydeco plaintiffs' loss was "between 2.9 and 6.9" with "4.9 million" as a midpoint, "but actually variability implies between 2.9 and 6.9." At trial, when questioned about estimating $4,900,000.00 as the amount of damages for lost income, Mr. Wood would consistently follow that statement with "plus or minus a couple million." Given Mr. Wood's broad range for lost income, we find the trial court was manifestly erroneous in awarding damages in the amount of $4,900,000.00 because Mr. Wood did not commit to that specific amount. Accordingly, we amend the judgment and reduce the award of damages to the Zydeco plaintiffs for lost income to $2,900,000.00.

*Penalties*

Underwriters contends that even if the Zydeco plaintiffs are entitled to penalties, the penalty should be reduced because it exceeds the maximum penalty allowed under La. R.S. 22:1973.

When an insurer has breached its duty of good faith and fair dealing, "the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the *damages sustained* or five thousand dollars, whichever is greater." La. R.S. 22:1973 C. (Emphasis added.) The duties of an insurer under

this statute are separate and distinct from its duties under the insurance contract. Durio v. Horace Mann Ins. Co., 11-84 (La. 10/25/11), 74 So.3d 1159, 1170. The Louisiana Supreme Court stated that because it is a violation of the statute which triggers the penalty provision and not a breach of the insurance contract, it would be inconsistent to hold that contractual amounts due pursuant to the terms of the contract should be included as "damages sustained." Id. The Supreme Court held that "Considering the statute in its entirety and applying the words of the statute as written, the only logical reading is that the 'damages sustained' in Section (C) are the same 'damages sustained as a result of the breach' in Section (A)." The Court further held that under La. R.S. 22:1973, "A logical and consistent reading of the statute mandates a finding that contractual damages due or awarded under the insurance contract should not be used to calculate penalties under the statute." Id. at 1170-1171.

Applying the above principles of Durio, we find that the trial court erred by including damages awarded under the insurance contract for loss of building and debris removal in the calculation of penalties. The Zydeco plaintiffs were awarded lost income damages for the loss of their business as a result of Underwriters' breach of its duties under La. R.S. 22:1973 A and C in the amount of $2,900,000.00, as herein amended. The penalties provided by La. R.S. 22:1973 C may not exceed twice the damages sustained due to the insurer's breach. Accordingly, we reduce the penalty awarded by the trial court from $12,314,123.72 to $5,800,000.00, which is twice the damages which resulted from Underwriters' bad faith breach.

*Comparative fault*

Underwriters contends that Brennan was solidarily liable with Underwriters for the damages claimed by the Zydeco plaintiffs and that Brennan should have been found solidarily liable for bad faith damages. Underwriters contends that the evidence at trial showed that Brennan breached its duty in failing to go over the application, policy, and the endorsements with the Gaineys, and failed to deliver the

policies to the Gaineys. Underwriters also contends that Brennan's settlement with the Zydeco plaintiffs reduces the Zydeco plaintiffs' recovery for bad faith damages by the percentage of Brennan's proportionate fault. Underwriters further contends that the Zydeco plaintiffs' own fault contributed to the bad faith damages, and thus the bad faith damage award should also be reduced in proportion to their fault. In this regard, Underwriters rely on the Gaineys' failure to read any of the insurance applications prior to signing and their failure to read any of the insurance policies containing the P2 endorsement.[38]

The Zydeco plaintiffs respond that comparative fault is irrelevant in a contract case. The Zydeco plaintiffs contend that this case involves insurance and contract issues, not issues of tort liability and comparative fault under La. C.C. art. 2315, *et seq.* The Zydeco plaintiffs contend that Brennan is not solidarily liable with Underwriters. An obligation is solidary for the obligors when each obligor is liable for the whole performance. La. C.C. art. 1974. The Zydeco plaintiffs argue that Brennan is an insurance agent, who was not responsible for adjusting or paying the claim, and did not have any input in the decision to rescind the policy. Because Brennan and Underwriters were not bound for the same performance, and the Zydeco plaintiffs did not allege solidary liability, Brennan is not a solidary obligor.

The Zydeco plaintiffs further argue that because insureds cannot rescind a policy, comparative fault of the insureds is not applicable in this case. At trial, Underwriters argued that the Zydeco plaintiffs intentionally deceived Underwriters in that they made a material misrepresentation regarding the centrally monitored fire alarm, and now they are alleging that the Zydeco plaintiffs are merely negligent and at fault for the rescission of the policy. Underwriters, as the insurer, was the only party who had the ability to rescind the policy, and Brennan and the Zydeco plaintiffs are not comparatively at fault.

---

[38] At trial, Underwriters also argued that Braishfield was comparatively at fault for the bad faith damages despite being dismissed from the case pursuant to La. C.C.P. art. 966 G. The trial court denied this claim and Underwriters did not appeal that ruling.

Upon review, we find the trial court was not manifestly erroneous or clearly wrong in finding that Brennan and the Zydeco plaintiffs are not comparatively at fault for the damages sustained by the Zydeco plaintiffs for Underwriters' bad faith handling of the claim during the 89-day period prior to rescission. The evidence showed that Underwriters' actions and inactions in failing to investigate and adjust the Zydeco plaintiffs' claims fairly and promptly prior to the decision to rescind the policy resulted in the damages to the Zydeco plaintiffs. Those bad faith damages were not caused by the actions of Brennan and/or the Zydeco plaintiffs. When there are two permissible views, the trial court's finding in favor of one cannot be manifestly erroneous or clearly wrong. Accordingly, this assignment of error is without merit.

### *Attorney's Fees*

In its fourth assignment of error, appellant contends that the award of attorney fees should be vacated or reduced for two reasons: (1) the trial court awarded over $7.3 million in attorney fees without requiring any proof of fees or conducting the analysis required by law; and (2) because the Zydeco plaintiffs chose to recover penalties under one penalty statute, La. R.S. 22:1973, they are foreclosed from recovering attorney fees under another penalty statute, La. R.S. 22:1892.

The Zydeco plaintiffs contend that the trial court did not abuse its discretion in awarding attorney fees and that the trial court did not err in applying La. R.S. 22:1973 and La. R.S. 22:1892. Furthermore, the Zydeco plaintiffs argue that the trial court's reasons included the Rivet factors and analysis thereof.

In Louisiana, a prevailing party may not recover attorney fees except where authorized by contract or statute. Rivet v. State, Dep't of Transp. and Dev., 96-145 (La. 09/05/96), 680 So.2d 1154, 1160. An award of attorney fees will not be modified on appeal absent a showing of an abuse of discretion. Master Credit Corp. v. Campbell & Associates, Inc., 98-349 (La. App. 4 Cir. 11/25/98), 724 So.2d 266, 267.

When awarding attorney fees, the trial court must determine the reasonableness of the attorney's fees to be awarded. Rivet, 680 So.2d at 1161; Willwoods Cmty. v. Essex Ins. Co., 09-651 (La. App. 5 Cir. 04/13/10), 33 So.3d 1102, 1112. The trial court should consider the following factors in determining a reasonable amount of attorney fees to award: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation: (4) the amount of money involved; (5) the extent and character of the work performed; (6) the legal knowledge, attainment, and skill of the attorneys; (7) the number of appearances involved; (8) the intricacies of the facts involved; (9) the diligence and skill of counsel; and (10) the court's own knowledge. Rivet, 680 So.2d at 1161.

Upon review, we find that the record does not contain any evidence to show that the trial court considered the Rivet factors in awarding attorney's fees in this case, as no evidence was introduced at trial concerning attorney's fees. Therefore, we find the trial court abused its discretion in awarding the Zydeco plaintiffs $7,388,474.23. Accordingly, we vacate that portion of the trial court's judgment awarding attorney's fees in the amount of $7,388,474.23 and remand this matter to the trial court for an evidentiary hearing to determine a reasonable amount of attorney's fees.

As to Underwriters' other argument that because the Zydeco plaintiffs chose to recover penalties under one penalty statute, La. R.S. 22:1973, they were foreclosed from recovering attorney fees under another penalty statute, (La. R.S. 22:1892), we find this argument without merit.

There is a close relationship between the conduct described in La. R.S. 22:1892 B(1) and the conduct described in La. R.S. 22:1973 B(5). See Theriot v. Midland Risk Ins. Co., 95-2895 (La. 05/20/97), 694 So.2d 184, 192 n.14. In fact, the conduct is virtually identical, i.e., the failure to timely pay a claim after receiving satisfactory proof of loss when that failure to pay is arbitrary, capricious, or without probable case. The primary difference is that under La. R.S. 22:1892 A(1) and B(1),

the insurer must pay the claim within thirty days of receiving satisfactory proof of loss, rather than the longer sixty-day period under La. R.S. 22:1973 B(5). <u>Calogero v. Safeway Ins. Co. of Louisiana</u>, 99-1625 (La. 01/19/00), 753 So.2d 170, 174.

Unlike La. R.S. 22:1892, the penalty provision of La. R.S. 22:1973 is applicable only after a showing is made of actual damages resulting from the breach of the insurer's duties. <u>Khaled v. Windham</u>, 94-2171 (La. App. 1 Cir. 06/23/95), 657 So.2d 672, 680, <u>writs dismissed</u>, 95-1914 (La. 11/01/95), 661 So.2d 1369.

Where La. R.S. 22:1973 provides the greater penalty, it supersedes La. R.S. 22:1892, such that the insured cannot recover penalties under both statutes. However, because La. R.S. 22:1973 does not provide for attorney fees, the insured is entitled to recover the greater penalties under its provisions and attorney fees under La. R.S. 22:1892 for its insurer's arbitrary or capricious failure to timely pay his claim after receiving satisfactory proof of loss. See <u>Calogero</u>, 753 So.2d at 174.

Accordingly, we do not find the trial court erred in applying both La. R.S. 22:1973 and La. R.S. 22:1892 and determining that the Zydeco plaintiffs are entitled to attorney's fees under La. R.S. 22:1892, subject to a <u>Rivet</u> hearing to determine the amount and reasonableness of attorneys' fees.

*Legal Interest*

Underwriters, in its fifth assignment of error, contends that the judgment erroneously awards legal interest on the entire award, including penalties and attorney fees, from the date of judicial demand. Underwriters contends that legal interest on penalties and attorney fees should be from the date of judgment. In response, the Zydeco plaintiffs concede that since the amount of penalties and attorney's fees were unknown until the date of judgment, legal interest on penalties and attorney's fees should be from date of judgment.

"Interest on penalties cannot be figured until penalties are imposed. . . . the penalties imposed on insurers become due only after the date of their award, and

interest on such penalties is due only from the date of judgment." Sher v. Lafayette Ins. Co., 07-2441 (La. 04/08/08), 988 So.2d 186, 203.

Accordingly, we reverse that portion of the judgment awarding legal interest for penalties and attorney's fees from the date of judicial demand. Because we vacated the award of attorney's fees for the reasons stated above, we only render judgment awarding legal interest for penalties from the date of judgment, and affirm as rendered.

**DECREE**

For the reasons stated herein, we affirm the trial court's findings that (1) Underwriters improperly rescinded the insurance policy; (2) Underwriters violated its duties of good faith and fair dealing in the investigation and adjustment of the May 30, 2016 fire loss in violation of La. R.S. 22:1973; (3) Underwriters failed to pay the Zydeco plaintiffs' claim within 30 days of receiving satisfactory proof of loss in violation of La. R.S. 22:1892; and (4) as a result of Underwriters' improper rescission of and violations of La. R.S. 22:1973 and La. R.S. 22:1892, the Zydeco plaintiffs sustained damages and are entitled to statutory penalties.

We further affirm the trial court's findings that (1) comparative fault is not applicable to Brennan and the Zydeco plaintiffs; and (2) La. R.S. 22:1973 and La. R.S. 22:1892 are applicable in this case.

For the reasons stated herein, we amend the judgment and award the following damages to the Zydeco plaintiffs: (1) $900,000.00 for loss of the building and $100,000.00 for business personal property; (2) $2,900,000.00 for lost income; and (3) $5,800,000.00 for bad faith damages.

We vacate that portion of the trial court's judgment awarding attorney's fees in the amount of $7,388,474.23 and remand this matter to the trial court for further proceedings consistent with this opinion.

We further reverse in part that portion of the judgment awarding legal interest on penalties and attorney's fees from the date of judicial demand until paid and

render judgment awarding legal interest as to the award of penalties from the date of judgment. The judgment is affirmed as amended and affirmed in all other respects.

**<u>AFFIRMED IN PART; AMENDED IN PART AND AFFIRMED AS AMENDED; REVERSED IN PART; AND VACATED IN PART</u>**

ZYDECO'S II, LLC, ZYDECO'S CORP,          NO. 19-CA-562
DUSTIN GAINEY AND ROSEMARIE
GAINEY                                    FIFTH CIRCUIT

VERSUS                                    COURT OF APPEAL

CERTAIN UNDERWRITERS AT                   STATE OF LOUISIANA
LLOYD'S, LONDON SUBSCRIBING TO
CERTIFICATE/POLICY NO.
D1180D150152-59633, DAVID
BRENNAN, DAVE BRENNAN
INSURANCE INC., AND BRAISHFIELD
ASSOCIATES, INC.

## JOHNSON, J., DISSENTS IN PART WITH REASONS

I agree with the majority opinion with the exception of the finding that the trial court committed manifest error in awarding $4,900,000 for lost income, resulting in an amended award by this Court. I find no error in the trial court's award of $4,900,000.00 for loss of income. The credited expert's testimony estimated the value of the plaintiffs' loss income between $2.9 million and $6.9 million. After direct, cross, and redirect examination of both the plaintiffs' and the defendants' expert witnesses regarding the valuation of the plaintiffs' business, the trial judge determined that the plaintiffs were entitled to $4,900,000.00 in damages to compensate them for loss of income. I do not believe that this is an instance where this Court should disturb an award of general damages. *See Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La. 1993). In awarding general damages, the trier of fact is afforded great discretion. *Normand v. Jones*, 12-508 (La. App. 5 Cir. 4/10/13); 115 So.3d 1. In this case, I find that there was a reasonable factual basis for the award and the record does not support a finding that the trial court was clearly wrong, or manifestly erroneous. Therefore, I respectfully dissent only from the part of the majority opinion that substitutes this Court's factual findings for those of the trial court in amending the damages award for loss of income.

19-CA-562                    1

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN S. BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **MAY 28, 2021** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

# 19-CA-562

### E-NOTIFIED
29TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE CONNIE M. AUCOIN (DISTRICT JUDGE)

GRAHAM J. REES (APPELLEE)
ROBERT P. CHARBONNET, JR. (APPELLEE)
MARTIN A. STERN (APPELLANT)
MARK C. LANDRY (APPELLEE)

JOEL T. CHAISSON, II (APPELLEE)
ALEXANDRA G. ROSELLI (APPELLANT)
RAYMOND P. WARD (APPELLANT)

RICHARD D. RONIGER, II (APPELLEE)
LENA D. GIANGROSSO (APPELLANT)
JAMES H. GIBSON (APPELLEE)

### MAILED
HONORABLE EMILE R. ST. PIERRE
(DISTRICT JUDGE)
DIVISION "C"
29TH JUDICIAL DISTRICT COURT
P. O. BOX 424
HAHNVILLE, LA 70057

HENRY S. PROVOSTY (APPELLANT)
ZACHARY P. FICKES (APPELLANT)
ATTORNEYS AT LAW
650 POYDRAS STREET
SUITE 2700
NEW ORLEANS, LA 70130

JAMES S. REES, IV (APPELLEE)
ATTORNEY AT LAW
3750 SOUTH CLAIBORNE AVENUE
NEW ORLEANS, LA 70125

STACY N. KENNEDY (APPELLEE)
ATTORNEY AT LAW
POST OFFICE BOX 52124
LAFAYETTE, LA 70505

PETER M. DONOVAN (APPELLEE)
ATTORNEY AT LAW
4640 RYE STREET
SUITE 100
METAIRIE, LA 70006